# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS**

**CASE NO.:  1:24-CV-00650**

TRIANGLE EXPERIENCE GROUP, INC.,

        Plaintiff,

v.

MAX MINDS, LLC,

        Defendant.

_____

## [PROPOSED] FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES TO COMPLAINT, AND FIRST AMENDED COUNTERCLAIMS

Defendant, Max Minds, LLC ("MAX" or "Defendant"), by counsel, for its Answer and Defenses to Plaintiff Triangle Experience Group, Inc.'s ("TEG's" or "Plaintiff's") Complaint and Counterclaim, states the following:

## DEFENDANT'S RESPONSES TO ALLEGATIONS IN THE COMPLAINT

### Summary

1.        The parties entered into a Joint Venture Agreement ("Agreement"), as set forth as Exhibit 1. Under the Agreement, the parties were to collaborate on creating a new software system, "Haptic," which could be used by both Federal and Commercial entities. Under the Agreement, the parties would co-own the technology created by the collaboration, and the parties would share 50/50, the revenues generated by their collaboration, with some exceptions.

**ANSWER:** MAX admits the allegation in paragraph 1 of the complaint that the parties entered into a Joint Venture Agreement. MAX denies the rest of paragraph 1 of the complaint, which mis-states the terms and substance of the Joint Venture Agreement.

2.      The Defendant breached the Agreement by: 1) creating a defective product for the Federal space that failed catastrophically, 2) failing to update the Haptic Federal version of the software, 3) by using the funding provided by the Plaintiff to update Haptic Federal into a commercial product known as "Alleo," and 4) refusing to share with the Plaintiff the revenues generated by the Defendant's own sales of Haptic, Haptic Federal and/or Alleo, all of which were essentially the same product, with different updates.

**ANSWER:** MAX denies the allegations in paragraph 2 of the complaint.

3.      The Defendant breached its warranty of implied fitness for a particular purpose because the software failed catastrophically.

**ANSWER:** MAX denies the allegations in paragraph 3 of the complaint.

### Parties

4.      The Plaintiff TEG is a Virginia stock corporation with its principal place of business in Ashland, Virginia, with the address shown in the caption. TEG specializes in providing services to the federal government.

**ANSWER:** MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 4 of the complaint, and therefore denies them.

5.      Max Minds, LLC ("Max Minds" or "Defendant") is an Indiana limited liability company, with a principal place of business in Carmel, Indiana, with the address shown in the caption. Max Minds was created on May 3, 2018. Upon information and belief, Max Minds' sole member is Brandon Fischer ("Fischer") who is domiciled at the address shown in the caption.

**ANSWER:** MAX denies that Mr. Fischer is domiciled at the address shown in the caption of the complaint. Mr. Fischer is domiciled in Indiana. MAX admits the remaining allegations in paragraph 5 of the complaint.

**Jurisdiction & Venue**

6.      This Court has subject matter jurisdiction pursuant to 28 USC§ 1332(a)(l) because this matter involves claims between citizens of different states where the amount in controversy exceeds $75,000.

**ANSWER:** MAX admits the allegations in paragraph 6 of the complaint.

7.      Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

**ANSWER:** MAX admits the allegations in paragraph 7 of the complaint to the extent "Court" refers to the Southern District of Indiana, Indianapolis Division. MAX denies the allegations in paragraph 7 of the complaint to the extent the "Court" refers to any other forum.

8.      Max Minds is subject to personal jurisdiction in this Court because it entered into contracts requiring performance in Virginia, caused harm in Virginia, derived substantial revenue from Virginia, breached contracts in Virginia, and regularly conducts business in Virginia.

**ANSWER:** MAX admits that MAX is subject to personal jurisdiction in the Southern District of Indiana, Indianapolis Division. MAX denies the remaining allegations in paragraph 8 of the complaint.

**Facts**

9.      TEG was formed in 2012 as a service disabled veteran owned small business that provides services and support to the United States government pursuant to government contracts.

**ANSWER:** MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9 of the complaint, and therefore denies them.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

10.      Since its inception, TEG has successfully provided cutting edge military technology to the United States government through various contract vehicles and has enjoyed fruitful and lasting relationships with several customers within the Department of Defense.

**ANSWER:** MAX denies the allegations in paragraph 10 of the complaint. Since its inception, TEG has resold and/or distributed military technology that was created by other technology companies.

11.      One of TEG's premier services that it provides to the Government customer is an operating system originally known as "C4MAP" - "Comprehensive Collaborative Command & Control Mission Application Platform."

**ANSWER:** MAX denies the allegations in paragraph 11 of the complaint.

12.      C4MAP is a collection of commercial off the shelf ("COTS") software components which integrates multiple mission command platforms and collaboration tools into one common operational picture ("COP").

**ANSWER:** MAX denies the allegations in paragraph 12 of the complaint. Haptic Federal can be described as a collection of commercial off the shelf ("COTS") software components that integrates multiple mission command platforms and collaboration tools into one common operational picture ("COP").

13.      C4MAP provides a globally military-hardened, distributed, synchronized, uniform collaborative, highly secure operation center. In essence, C4MAP provides the fusion and interconnection of information on a single screen, which has limitless benefits to the United States and Department of Defense.

**ANSWER:** MAX denies the allegations in paragraph 13 of the complaint. Haptic Federal can be described as a globally military-hardened, distributed, synchronized, uniform

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

collaborative, highly secure operation center that provides the fusion and interconnection of information on a single screen, which has limitless benefits to the United States and Department of Defense.

14.      C4MAP is also known as "Virtual Joint Operations Center" ("VJOC") capability in the Department of Defense (DoD) and Intelligence Community (IC).

**ANSWER:** MAX denies the allegations in paragraph 14 of the complaint. "VJOC" is not a term exclusive to "C4MAP" or TEG. VJOC is an acronym commonly used within the U.S. Department of Defense for various purposes.

15.      C4MAP, or, VJOC, is a server-based collaborative workspace that uses a browser interface to enable users to collaborate in real time. VJOC has screensharing capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the VJOC workspace.

**ANSWER:** MAX denies the allegations in paragraph 15 of the complaint. Haptic Federal can be described as a server-based collaborative workspace that uses a browser interface to enable users to collaborate in real time. Haptic Federal has screensharing capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the Haptic Federal workspace.

16.      The VJOC workspace is an infinite canvas of screen real estate that operates synchronously for all members in real-time.

**ANSWER:** MAX denies the allegations in paragraph 16 of the complaint. Haptic Federal can be described as an infinite canvas of screen real estate that operates synchronously for all members in real-time.

17.     The benefits of VJOC to the United States Department of Defense are essentially limitless and incredibly valuable.

**ANSWER:** MAX denies the allegations in paragraph 17 of the complaint. Haptic Federal offers substantial benefits, and the capabilities of Haptic Federal are highly regarded within the defense community.

18.     TEG has enjoyed a long history of providing C4MAP and its capabilities to the Department of Defense.

**ANSWER:** MAX denies the allegations in paragraph 18 of the complaint. Since its inception, TEG has resold and/or distributed military technology that was created by other technology companies.

19.     C4MAP, like any operating system, requires a source code for configuration, installation, operation, integration and deployment to deliver capabilities.

**ANSWER:** MAX denies the allegations in paragraph 19 of the complaint. "C4MAP" is a brand name created by TEG and does not consist of an independent operating system. Haptic Federal delivers the "capabilities" referenced in paragraph 19 of the complaint.

20.     Initially, C4MAP was powered by a source code known as "Synthesis," which was owned by a company known as Prysm.

**ANSWER:** MAX admits the allegation in paragraph 20 of the complaint that "Synthesis" was a source code owned by a company known as Prysm. MAX lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 20 of the complaint, and therefore denies them.

21.     Fischer was formerly a senior software developer at Prysm.

**ANSWER:** MAX denies the allegations in paragraph 21 of the complaint. Mr. Fischer was formerly the Founder and CEO of a company known as Anacore, which merged with Prysm in 2014. Mr. Fischer became a Vice President at Prysm after the merger.

22.     While a Prysm employee, Fischer attended multiple presentations of C4MAP in Virginia, during which time TEG and its engineers demonstrated C4MAP and its capabilities.

**ANSWER:** MAX admits the allegation in paragraph 22 of the complaint that while Mr. Fischer was a Prysm employee, he attended multiple presentations with TEG. MAX denies the remaining allegations in paragraph 22 of the complaint.

23.     Fischer was impressed and inquired whether there might be an opportunity for him to work with TEG. Specifically, in April 2018, Fischer inquired about forming a partnership regarding C4MAP, with Fischer providing the source code to power the operation system. TEG declined as Fischer was subject to a non-competition agreement with Prysm. By May 2018, Fischer founded Max Minds to provide general software solutions to customers.

**ANSWER:** MAX admits the allegation in paragraph 23 of the complaint that Mr. Fischer founded Max Minds, LLC in May 2018. MAX denies the remaining allegations in paragraph 23 of the complaint. Mr. Fischer, in fact, advised TEG (in response to its inquiry in the Spring of 2018) that he could not work with TEG because of his non-competition agreement with Prysm.

24.     In July 2019, after the non-competition period had expired, Fischer contacted TEG again and indicated his desire to partner with TEG. On July 2, 2019, Fischer wrote to TEG stating that he was coming to Washington, DC and would like to meet with TEG. To that end, he further stated:

> For full transparency, my goal is to find a partner who is willing to invest in my team and our product and, in return, receive special licensing

terms/conditions that allows them to make 2x return on their investment + a period of exclusivity in the federal space. Would love for you guys to be that partner and I hope we can find a time to get together that week. If you'd like to talk beforehand, just let me know.

**ANSWER:** MAX admits the allegation in paragraph 24 of the complaint that on July 2, 2019, Mr. Fischer wrote an email to TEG that contained, among other things, the block-quoted text in paragraph 24 of the complaint. MAX denies remaining allegations in paragraph 24 of the complaint.

25.    At this time, Max Minds did not actually have any software system.

**ANSWER:** MAX denies the allegations in paragraph 25 of the complaint.  MAX was, in fact, traveling to demonstrate a working version of its software.

26.    On July 17, 2019, TEG and Max Minds entered into a non-disclosure agreement which is attached as Exhibit 2 (''NDA Agreement"). Under the NDA agreement, Max Minds promised to keep TEG's information confidential for five years.

**ANSWER:** MAX admits the allegation in paragraph 26 of the complaint that on July 17, 2019, TEG and MAX entered into a non-disclosure agreement. MAX denies the remaining allegations in paragraph 26 of the complaint. The non-disclosure agreement was mutual and both parties agreed to hold each other's "Confidential Information in confidence for a period of five (5) years."

27.    After entering into the NDA agreement, TEG brought Fischer/Max Minds to the Federal government's C4MAP Lab in Suffolk, Virginia. TEG then showed Fischer the critical information necessary to operate a virtual collaborative workspace. Fischer explained to TEG that he wanted TEG to hire and/or partner with Max Minds to build and improve TEG's C4MAP's system with new software.

**ANSWER:** MAX admits the allegation in paragraph 27 of the complaint that after MAX entered into the non-disclosure agreement with TEG, MAX visited a government facility in Suffolk, Virginia. MAX denies the remaining allegations in paragraph 27 of the complaint. MAX further states that the government facility referenced in paragraph 27 of the complaint is the Joint Staff Lab, not a "C4MAP Lab." Also, the purpose of the visit was to demonstrate MAX's "Haptic" platform to leaders within the Joint Staff Lab.

28.      After July 2019, Fischer used the confidential information provided to him by TEG and worked with TEG's employees to create a BETA version of a new software, known as "Haptic."

**ANSWER:** MAX denies the allegations in paragraph 28 of the complaint.

29.      On October 5, 2019, Fischer emailed TEG and invited TEG to virtually test the new software. After October 5, 2019, Fischer and TEG's staff worked to improve Haptic, as detailed by the chat log of activity, albeit doing so without any agreement other than the non-disclosure agreement.

**ANSWER:** MAX admits the allegation in paragraph 29 of the complaint that Mr. Fischer emailed TEG in October 2019. MAX emailed TEG on October 2, 2019, to provide TEG with Haptic user accounts, allowing them to access and demonstrate the Haptic platform live to third parties, subject to the Haptic Privacy Policy and other terms and conditions. MAX denies the remaining allegations in paragraph 29 of the complaint.

30.      On November 5, 2019, Fischer met with TEG in Chantilly, Virginia to discuss the new capability moving forward with funding for a new product called Haptic.

**ANSWER:** MAX admits the allegation in paragraph 30 of the complaint that in November 2019 Mr. Fischer met with TEG in Chantilly, Virginia. The meeting occurred on

November 7, 2019. MAX denies the remaining allegations in paragraph 30 of the complaint. MAX further states that Haptic already existed by November 7, 2019.

31.     As of January 23, 2020, Haptic was a joint work of both Max Minds and TEG, though Max Minds' use of Haptic was limited by the NDA Agreement.

**ANSWER:**   MAX denies the allegations in paragraph 31 of the complaint and further states that the development and ownership of Haptic is fully attributable to MAX.

32.     On January 23, 2020, TEG and Max Minds executed the Joint Venture Agreement ("JV Agreement"), identified previously as Exhibit 1.

**ANSWER:**   MAX admits the allegation in paragraph 32 of the complaint.

33.     Pursuant to the JV Agreement, TEG would make a series of payments to Max Minds, and in return, Max Minds would "create and maintain" a branch of the Haptic source code, called "Haptic Federal." So long as TEG hit certain sales goals, then TEG would exclusively provide Haptic Federal to the Federal government.

**ANSWER:**   MAX admits the allegation in paragraph 33 of the complaint that pursuant to the JV Agreement, TEG would make a series of payments to MAX, and MAX would "create and maintain" a branch of the Haptic source code, called "Haptic Federal." MAX denies the remaining allegations in paragraph 33 of the complaint. Paragraph 33 of the complaint is not an accurate summary of the JV Agreement. Paragraph 33 of the complaint also does not state the entirety of terms and conditions in the JV Agreement.

34.     The parties agreed that Max Minds would provide TEG with software updates no less than once every three months.

**ANSWER:** MAX denies the allegations in paragraph 34 of the complaint. The JV Agreement states that "Retainer payments will be used by MAX for the following: . . . As the

commercial Haptic platform evolves, MAX will provide TEG with a software update at least once every 3 months; . . ." MAX further states that it exceeded this requirement by providing over 30 software updates between January 2020 and December 31, 2023.

35.     While the parties agreed that any intellectual property resulting from future custom software development paid by TEG would be co-owned by TEG and Max Minds, the JV Agreement did not specifically address the ownership of the original Haptic source code.

**ANSWER:** MAX denies the allegations in paragraph 35 of the complaint. MAX further states that the JV Agreement provides "Any Intellectual Property ("IP") resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX, except any plug-in features paid for by the government that are contractual deliverables to the govt customer." Further, TEG never paid MAX for any "custom software development" in the course of their business relationship.

36.     Nevertheless, the JV Agreement provided that the parties would share all revenues 50/50, when using co-owned intellectual property, with certain exceptions.

**ANSWER:** MAX denies the allegations in paragraph 36 of the complaint. MAX further states that the JV Agreement provides:

**"TEG and MAX revenue share:**

- 50% on total sale of Haptic Federal product and user license sales in federal customer and opportunity business space

  - Exceptions: Training, A/V installs, additional H/W expenses, accessories

- 50% on total sale in non-federal opportunities, when using co-owned IP

  - Exceptions: Any non-federal sale opportunity exclusive to TEG or MAX"

37.     The Haptic source code, including all of its branches, are co-owned by TEG and Max Minds.

**ANSWER:** MAX denies the allegations in paragraph 37 of the complaint. MAX further states that MAX is the sole owner of the Haptic source code, including all of its branches.

38.     In May 2020, TEG demonstrated the new C4MAP, powered by Haptic, to the Commanding General of the U.S. Army's XVIII Airborne Corps. The success of this demonstration led to the US Army sponsoring an IATT (Interim Authority To Test) and the first large-scale fielding and testing of C4MAP powered by Haptic (Beta).

**ANSWER:** MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 of the complaint and therefore denies them.

39.     From August 2020 through October 2020, the U.S. Army tested the new C4MAP powered by Haptic. This testing resulted in the identification of approximately 250 fixes that were needed to solve various problems.

**ANSWER:** MAX admits that from August 2020 through October 2020, the U.S. Army tested Haptic Federal, which TEG referred to as "C4MAP powered by Haptic" at the time. MAX denies the remaining allegations in paragraph 39 of the complaint.

40.     Despite the large number of problems, the Army viewed C4MAP powered by Haptic as a "game changer," and that led to new challenges.

**ANSWER:**   MAX denies the allegation in paragraph 40 of the complaint that there was a large number of problems with Haptic. MAX lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 40 of the complaint and therefore denies them.

41.     In October 2020, C4MAP, powered by Haptic, was used by XVIII Airborne Corps for testing and fielding of the new capability. The new capability was recommended by XVIII Airborne Corps by the Joint Special Operations Command, who had previously tested the capability.

**ANSWER:** MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 of the complaint and therefore denies them.

42.     In February 2021, TEG invited Fischer to Ft. Hood, Texas so that he could see how the US Army intended to use C4MAP. Fischer stated that he was "humbled and profoundly inspired."

**ANSWER:** To the extent that paragraph 42 of the complaint uses the term "C4MAP" to refer to the Haptic Federal software, MAX admits the allegation in paragraph 42 of the complaint that in February 2021, TEG invited Mr. Fischer to Ft. Hood, Texas so that he could see how the U.S. Army intended to use C4MAP. To the extent that paragraph 42 of the complaint uses the term "C4MAP" to refer to anything other than the Haptic Federal software, MAX denies the allegations in paragraph 42 of the complaint. MAX denies the remaining allegations in paragraph 42 of the complaint.

43.     In March 2021, TEG submitted the Haptic to the U.S. government for evaluation. As TEG was able to prove the value of C4MAP across the DOD during the initial IATT, the government had decided to obtain a full ATO (Authority To Operate) on a classified network.

**ANSWER:**   MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 of the complaint and therefore denies them.

44.     In August 2021, TEG received an email from John McDonald of Next Studios. He did not have an NDA, but he explained that Max Minds has asked him to manage processes.

**ANSWER:**     MAX lacks knowledge or information sufficient to form a belief about the truth of (and therefore denies) the allegation in paragraph 44 of the complaint that in August 2021, TEG received an email from John McDonald of Next Studios. MAX denies the remaining allegations in paragraph 44 of the complaint. MAX further states that MAX and Next Studios entered into an agreement including, among other things, a non-disclosure clause on December 16, 2020.

45.     In October 2021, Fischer informed TEG that he was developing a use case to use with potential investors. Fischer failed to state whether he had provided an NDA to potential investors or had informed them that TEG was Haptic's co-developer.

**ANSWER:** MAX denies the allegations in paragraph 45 of the complaint.

46.     In November 2021, the US Army purchased the fielded version of C4MAP powered by Haptic to accredit the software. This was the last version that functioned properly. It is known as the 3.1.17 version.

**ANSWER:** To the extent that paragraph 46 of the complaint uses the term "C4MAP powered by Haptic" to refer to the Haptic Federal software, MAX admits the allegation in paragraph 46 of the complaint that in November 2021, the U.S. Army began purchasing licenses for the fielded version of C4MAP powered by Haptic to accredit the software, known as the 3.1.17 version. To the extent that paragraph 46 of the complaint uses the term "C4MAP powered by Haptic" to refer to anything other than the Haptic Federal software, MAX denies that allegation. MAX denies the remaining allegations in paragraph 46 of the complaint. MAX further states that the 3.1.17 version was not the last version of Haptic Federal that functioned properly.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

47.     On December 13, 2021, TEG learned, by logging on to c4map.hap.tc, that Max Minds had covertly changed Haptic's name to Alleo. When questioned, Fischer admitted that Alleo was simply a name change.

**ANSWER:** MAX admits the allegation in paragraph 47 of the complaint alleging that on December 13, 2021, TEG learned that MAX was changing the name of Haptic to Alleo. MAX denies the remaining allegations in paragraph 47 of the complaint.

48.     In a call on December 15, 2021, while TEG had provided substantial funding to fix the problems identified in testing with the federal government, Fischer indicated that he did not want to do any more custom engineering projects for TEG, unless there was a specific well-defined project. He noted that the "ownership of the IP" had muddied the waters. When asked about the name change of Alleo, Fischer's response was that he had given TEG too much access. When Fischer was questioned about the need for a separate branch of Haptic Federal, Fischer responded that that was his intent, "when that time comes." He had not made any such division yet, because it was too expensive.

**ANSWER:** MAX denies the allegations in paragraph 48 of the complaint.

49.     Whatever Fischer's intention, on April 1, 2022, Max Minds began advertising Alleo to government contractors, instead of Haptic.

**ANSWER:** MAX denies the allegations in paragraph 49 of the complaint.

50.     For the next year, the parties continued to work together, with TEG reporting occasional critical bugs to Max Minds, including, but not limited to: on April 5, 2022 (Presentation mode), April- September 2022 (Dumpster Blender), November 2022 (Configuration Tool). As a result of these failures, TEG did not make additional sales.

**ANSWER:** MAX denies the allegations in paragraph 50 of the complaint. MAX further states that TEG sold millions of dollars in licenses and support of Haptic Federal in 2023 alone.

51.     On December 8, 2022, TEG provided Fischer with a document prepared by the U.S. Central Command that outlined the government's concerns and priorities. Max Minds has never responded to this document.

**ANSWER:** MAX denies the allegations in paragraph 51 of the complaint.

52.     As a result of a test on January 4-5, 2023, another bug was identified in "Live Notepad" that oversaturated the application and customer network with message traffic.

**ANSWER:** MAX denies the allegations in paragraph 52 of the complaint. MAX further states that with respect to the "bug" referenced in paragraph 52 of the complaint, TEG first brought this concern to the attention of MAX on January 8, 2023. Once notified, the MAX team responded quickly to identify the problem and prepare a fix for TEG to test on January 13, 2023. Once TEG's testing was completed, an official software update (version 3.1.21.2) was made available on January 17, 2023.

53.     On January 10, 2023, the software failed to work as intended.

**ANSWER:** The "software fail[ure]" referenced in paragraph 53 of the complaint was due to the same "bug" referenced in paragraph 52 of the complaint. MAX admits that on January 10, 2023, MAX was preparing a fix to the "bug" identified in paragraph 52 of the complaint. MAX incorporates by reference its answer to paragraph 52 of the complaint. MAX denies the remaining allegations in paragraph 53 of the complaint.

54.     On January 15, 2023, the DoD began turning off aspects of the software, like Live Notepad, that were causing problems.

**ANSWER:** MAX admits the allegation in paragraph 54 of the complaint alleging that on January 15, 2023, the DoD turned off the Live Notepad aspect of the software. MAX further states that MAX suggested that DoD turn off the Live Notepad aspect of the software until the next software update was provided. MAX further states that the "problems" referenced in paragraph 54 of the complaint are the same as the "bug" referenced in paragraph 52 complaint and "software fail[ure]" referenced in paragraph 53 of the complaint. MAX incorporates by reference its answers to paragraph 52 and paragraph 53 of the complaint. MAX denies the remaining allegations in paragraph 54 of the complaint.

55.     On January 26, 2023, during a dress rehearsal for a full DoD exercise, users were not able to screen share, play video, and take leader control of the platform due to a problem in the Haptic code.

**ANSWER:** MAX admits that on January 26, 2023, certain functionalities within the Haptic Federal platform were temporarily affected during a DoD event. MAX denies the characterization of the event in paragraph 55 of the complaint. MAX denies the allegation in paragraph 55 of the complaint that the effects were "due to a problem in the Haptic code." MAX denies the remaining allegations in paragraph 55 of the complaint.

56.     On January 27-31, 2023, it was discovered that since providing the 3.1.17 version Max Minds had reduced the bitrate for video share quality. This was done unilaterally and without informing TEG. Max Minds then delivered a hot fix but said that it hadn't been able to test it.

**ANSWER:** MAX admits that changes were made to the video share quality settings in Haptic Federal after the delivery of version 3.1.17. Haptic Federal version 3.1.17 was provided to TEG on July 20, 2021. Following that update, and before TEG brought this to the attention of

MAX, there were at least six (6) new updates of Haptic Federal over approximately 18 months. Each of those updates passed TEG's and their customers' own scrutiny over video share quality. MAX is the owner and creator of the Haptic Federal software product and has the authority to make unilateral changes to its software without requiring TEG's permission. Still, MAX has consistently strived to maintain open communication and inform TEG of changes that may affect its usage of the software. TEG first raised this concern on January 26, 2023.  A "Hot Fix" software update (3.1.21.3) was provided to TEG on January 30, 2023. TEG asked to begin testing the release before MAX could perform the standard test procedure.

57.     On February 8, 2023, TEG's system maintenance detected new bugs.

**ANSWER:** MAX lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 57 of the complaint and therefore denies them.

58.     On February 22, 2023, TEG received the newest build from Max Minds (version 3.1.21.4). TEG immediately identified critical failures, such that the product was not useable.

**ANSWER:** MAX denies the allegations in paragraph 58 of the complaint. MAX further states that the version number in paragraph 58 of the complaint is incorrect and should refer to version 3.1.22, which was the official Q1 2023 release of Haptic Federal. Further, the "critical failures" referenced in paragraph 58 of the complaint refer to the presence of a "Support Expired" banner that appeared at the top of the application for customers who do not pay for annual renewal of the software. TEG had been notified of this update in November 2021. The banner only became visible when support for the first customer licenses began to expire in early 2023. The JV Agreement provides that there is an Annual Renewal requirement for customers to receive continued support and software upgrades. TEG has stated that all customers decided not to renew

17

their support. Despite this, TEG continues to support these customers against the terms of the JV agreement.

59.     On March 30, 2023, the US government scanned version 3.1.21.3, and identified more than 50 critical errors.

**ANSWER:**  MAX admits that on March 30, 2023, TEG shared with MAX the results of a U.S. government scan performed on open source content contained within Haptic Federal. MAX further states that TEG characterized the fifty issues identified as "critical errors" and that MAX worked diligently over the subsequent months to rectify such issues. MAX denies the remaining allegations in paragraph 59 of the complaint.

60.     On May 5, 2023, TEG notified Max Minds that it still does not have a product that it can sell. In fact, Max Minds has never provided TEG with a version that it can sell.

**ANSWER:** MAX denies the allegations in paragraph 60 of the complaint. MAX further states that in 2023, TEG generated millions of dollars of revenue by selling new licenses and providing support for Haptic Federal.

61.     Despite paying millions of dollars to Max Minds in engineering services, losing millions of dollars in attempting to repair Max Minds' failed efforts, and losing millions of dollars in sales, TEG discovered that Max Minds was actually releasing monthly updates to its Alleo product but failing to provide any new features and fixes to the Haptic federal product.

**ANSWER:** MAX admits the allegation in paragraph 61 of the complaint that MAX was releasing monthly updates to its Alleo (formerly Haptic) product. MAX denies the remaining allegations in paragraph 61 of the complaint. MAX further states that TEG has always received monthly emails notifying it of each release of Alleo. Further, MAX provided quarterly updates to Haptic Federal in addition to the "Hot Fixes" that TEG requested.

62.     Additionally, TEG learned that Max Minds had sold the Alleo software to one or more Federal government customers, even though TEG enjoyed exclusivity in the Federal government space until December 31, 2023.

**ANSWER:** MAX denies the allegations in paragraph 62 of the complaint. MAX further states that the exclusivity terms in the JV Agreement between TEG and MAX pertained to Haptic Federal, and MAX has upheld the terms of the JV Agreement.

## COUNT I: DECLARATORY JUDGMENT

63.     The allegations in paragraphs 1 - 62 are re-alleged herein.

**ANSWER:** MAX incorporates by reference, as if fully set forth herein, its responses to the allegations of paragraphs 1 through 62 of the complaint as set forth above.

64.     The software in question is all the same, whether it is called Haptic, Haptic Federal, Haptic Commercial or Alleo.

**ANSWER:** MAX denies the allegations in paragraph 64 of the complaint. MAX further states that the software in question is called Haptic Federal, which is a branch of Haptic, as explained in the JV Agreement. Further, Haptic predates Haptic Federal.

65.     TEG respectfully requests that the Court declare the software, and all versions of it, is owned by TEG and Max Minds on a 50/50 basis.

**ANSWER:** MAX denies the allegations in paragraph 65 of the complaint. MAX further states that MAX and TEG agreed in a Source Code License Agreement and End User License Agreement, among other places, that MAX is the sole owner of "the software" referenced in paragraph 65 of the complaint.

WHEREFORE, TEG respectfully requests that the Court declare that the software, whether it is called Haptic, Haptic Federal, Haptic Commercial or Alleo is the same software that is co-owned by TEG and Max Minds on a 50/50 basis, and to grant TEG the costs of the action.

**ANSWER:** MAX denies that TEG is entitled to any of the relief sought in the "WHEREFORE" paragraph of Count I of the complaint and denies any remaining allegations contained in the "WHEREFORE" paragraph of Count I of the complaint.

## COUNT II: BREACH OF CONTRACT

66.     The allegations in paragraphs 1 - 62 are re-alleged herein.

**ANSWER:**     MAX incorporates by reference, as if fully set forth herein, its responses to the allegations of paragraphs 1 through 62 of the complaint as set forth above.

67.     Max Minds breached the JV Agreement by failing to create and maintain a functioning source code.

**ANSWER:**     MAX denies the allegations in paragraph 67 of the complaint.

68.     Max Minds' breach proximately caused TEG to sustain million in losses, in terms of direct and consequential damages.

**ANSWER:**     MAX denies the allegations in paragraph 68 of the complaint.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $90 million, plus interest and costs.

**ANSWER:** MAX denies that TEG is entitled to any of the relief sought in the "WHEREFORE" paragraph of Count II of the complaint and denies any remaining allegations contained in the "WHEREFORE" paragraph of Count II of the complaint.

## COUNT III: BREACH OF WARRANTY

69.     The allegations in paragraphs 1 - 62 are re-alleged herein.

**ANSWER:** MAX incorporates by reference, as if fully set forth herein, its responses to the allegations of paragraphs 1 through 62 of the complaint as set forth above.

70.     Max Minds breached the implied warranty of fitness for a particular purpose by failing to create and maintain a functioning source code for the purpose of U.S. Military consumers.

**ANSWER:** MAX denies the allegations in paragraph 70 of the complaint. MAX further states that the End User License Agreement and Source Code License Agreement state that there is no warranty provided with the software.

71.     Max Minds' breach proximately caused TEG to sustain million in losses, in terms of direct and consequential damages.

**ANSWER:** MAX denies the allegations in paragraph 71 of the complaint.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $90 million, plus interest and costs.

**ANSWER:** MAX denies that TEG is entitled to any of the relief sought in the "WHEREFORE" paragraph of Count III of the complaint and denies any remaining allegations contained in the "WHEREFORE" paragraph of Count III of the complaint.

## COUNT IV: BREACH OF CONTRACT

72.     The allegations in paragraphs 1 - 62 are re-alleged herein.

**ANSWER:** MAX incorporates by reference, as if fully set forth herein, its responses to the allegations of paragraphs 1 through 62 of the complaint as set forth above.

73.     Max Minds' breached the JV Agreement by making sales of the software and failing to provide TEG with 50 percent of the revenues of such sales.

**ANSWER:** MAX denies the allegations in paragraph 73 of the complaint. MAX further states that the JV Agreement does not state that TEG is the exclusive distributor of all of MAX's software.

74.     Max Minds' breach proximately caused TEG to sustain an unknown amount of losses.

**ANSWER:** MAX denies the allegations in paragraph 74 of the complaint.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $10 million, plus interest and costs, or such other amount to be proved at trial.

**ANSWER:** MAX denies that TEG is entitled to any of the relief sought in the "WHEREFORE" paragraph of Count IV of the Complaint and denies any remaining allegations contained in the "WHEREFORE" paragraph of Count IV of the Complaint.

### COUNT V: BREACH OF THE NON-DISCLOSURE AGREEMENT

75.     The allegations in paragraphs 1 - 62 are re-alleged herein.

**ANSWER:** MAX incorporates by reference, as if fully set forth herein, its responses to the allegations of paragraphs 1 through 62 of the complaint as set forth above.

76.     Max Minds breached the Non-disclosure Agreement by providing TEG's confidential information to third parties, including vendors, investors, and other parties, without TEG's permission.

**ANSWER:** MAX denies the allegations in paragraph 76 of the complaint.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $10 million, plus interest and costs, or such other amount to be proved at trial.

**ANSWER:** MAX denies that TEG is entitled to any of the relief sought in the "WHEREFORE" paragraph of Count V of the Complaint and denies any remaining allegations contained in the "WHEREFORE" paragraph of Count V of the Complaint.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action for all claims so triable.

**ANSWER:** MAX admits that TEG demands a trial by jury on all issues so triable. MAX denies each and every allegation contained in the complaint that is not otherwise addressed herein.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant, Max Minds, LLC ("MAX" or "Defendant"), by counsel, for its Affirmative Defenses to Plaintiff Triangle Experience Group, Inc.'s ("TEG's" or "Plaintiff's") Complaint, states the following:

### First Affirmative Defense – Prior Material Breach

1.     MAX and TEG entered into the Joint Venture Agreement ("JVA") on January 23, 2020.

2.     The JVA imposes duties and obligations on TEG.

3.     TEG breached the duties and obligations imposed on it by the Joint Venture Agreement by:

   a.   Failing to meet revenue targets, paid to MAX, in 2021, 2022, and 2023.

   b.   Failing to create a distribution channel for Haptic Federal to the federal government.

   c.   Failing to deliver, deploy, sustain and develop customer requirements.

   d.   Failing to maintain a web presence for marketing material of the Haptic Federal product.

   e.   Providing discounts and failing to subtract the discount amount from TEG's share of revenue.

     f.   Providing support to customers that had not renewed licenses and retaining all of that revenue.

     g.   Failing to give MAX personnel access to TEG's commercial data center.

     h.   Failing to share an electronic files system.

     i.   Failing to work collaboratively with MAX on the preparation and delivery of proposals, marketing materials, and activity reporting to government customers.

     j.   Engaging in unauthorized and/or illegal license distribution.

     k.   Misusing licenses of Haptic Federal and circumventing the license key requirement of Haptic Federal.

4.     TEG's claims are barred, in whole or in part, by its own material breach(es) of the Joint Venture Agreement.

<u>Second Affirmative Defense – Fraud</u>

5.     TEG made false and material representations, misrepresentations and omissions to MAX including, without limitation, the following:

     a.   In the years 2020, 2021, 2022, and 2023, TEG represented to MAX that it received a certain amount of revenue from sales of Haptic Federal.

     b.   In the years 2020 and 2021, TEG represented to MAX that TEG was "waiting on the government" for significant amounts of revenue from sales of Haptic Federal.

     c.   In late 2022 and throughout 2023, TEG stated that MAX had never given TEG a product that works, and relatedly, TEG stated that Haptic Federal was unsellable.

**SRIPLAW**
Cᴀʟɪғᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Tᴇxᴀs ◆ Nᴇᴡ Yᴏʀᴋ

      d.  In August 2023, TEG misrepresented to MAX that none of the source code TEG previously received had been copied and all copies TEG previously received were destroyed.

6.     Representation (a) above was false and when it was made TEG knew it was false. The amount of revenue from sales of Haptic federal that TEG received was materially higher than the amount represented.

7.     Representation (b) above was false and when it was made TEG knew that it was false. TEG was not "waiting on the government" for revenue from sales of Haptic Federal. In fact, TEG had received revenue and simply chose to conceal this fact from MAX.

8.     Representation (c) above was false and when it was made TEG knew that it was false. TEG knew that Haptic Federal worked and TEG knew it could sell Haptic Federal. TEG knew this because TEG had in fact sold Haptic Federal to the government, a fact it concealed from MAX.

9.     Representation (d) above was false and when it was made TEG knew that it was false. TEG had copied and is currently licensing a version of Haptic federal that is based on the source code MAX shared with TEG pursuant to the SCLA, a fact that TEG concealed from MAX.

10.     TEG intended that MAX rely on each and every representation, misrepresentation, and omission above when they were made.

11.     TEG made the representations, misrepresentations, and omissions above to induce MAX to continue to maintain a relationship with TEG and not terminate its agreements with TEG despite TEG's repeated malfeasance.

12.     As a result of and in reliance on TEG's misrepresentations, MAX moved forward with TEG as its business partner and continued to maintain a relationship with TEG, all to MAX's detriment.

13.     TEG's claims are barred, in whole or in part, by TEG's fraudulent conduct in performance of the Joint Venture Agreement.

<u>Third Affirmative Defense – Fraud in the Inducement</u>

14.     TEG made false and material representations to induce MAX into entering the Joint Venture Agreement including, but not limited to, indicating that TEG would market Haptic Federal under the Haptic brand when, in fact, TEG planned to rebrand Haptic Federal as C4MAP or VJOC on most, if not all, marketing and license sale materials.

15.     TEG knew this representation to be false when it made it. In fact, TEG has been accused in previous litigation of engaging in this same practice. See 1:19-cv-00035 E.D.Va.

16.     As a result of and in reliance on TEG's misrepresentation, MAX moved forward with TEG as its business partner and entered into the Joint Venture Agreement.

17.     As a direct and proximate result of TEG's misrepresentations, MAX has been damaged in an amount to be proven at trial.

18.     TEG's claims are barred, in whole or in part, by TEG's fraudulent conduct in the inducement of the Joint Venture Agreement.

<u>Fourth Affirmative Defense – Unclean Hands</u>

19.     MAX hereby reincorporates and re-alleges all the preceding paragraphs of its Affirmative and Other Defenses as if fully set forth herein.

20.     TEG acted fraudulently and in bad faith when it did the following:

21.     Misrepresented revenue it had made from sales of Haptic federal in 2020, 2021, 2022, and 2023.

22.     Provided support to customers that had not renewed licenses and fraudulently hiding that revenue from Max.

23.     Refused to work collaboratively with MAX on the preparation and delivery of proposals, marketing materials, and activity reporting to government customers.

24.     Engaged in unauthorized and/or illegal license distribution.

25.     Backdated customers computers to provide extended licenses of the Software not authorized or consented to by Max.

26.     TEG's unconscionable and unethical acts listed above caused MAX to suffer damages.

27.     TEG's claims are barred, in whole or in part, because of the doctrine of unclean hands.

<u>Fifth Affirmative Defense – Ratification</u>

28.     MAX hereby reincorporates and re-alleges all the preceding paragraphs of its Affirmative and Other Defenses as if fully set forth herein.

29.     TEG knew of the alleged conduct by MAX that TEG alleges constituted breach of the Joint Venture Agreement.

30.     TEG knowingly sanctioned or affirmed MAX's alleged conduct.

31.     TEG's claims are barred, in whole or in part, because TEG's knowing sanction or affirmation of MAX's conduct was a ratification of MAX's performance of the Joint Venture Agreement.

<u>Sixth Affirmative Defense – Unjust Enrichment</u>

32.     MAX hereby reincorporates and re-alleges all the preceding paragraphs of its Affirmative and Other Defenses as if fully set forth herein.

33.     TEG's claims are barred, in whole or in part, because the relief sought would unjustly enrich TEG because the requested relief would require MAX to pay TEG 50% of its sales for its non-commercial software which TEG has no rights to.

34.     Moreover, TEG has retained Max's software which does not belong to TEG and is not entitled to the benefits it has received and is still receiving by its continued control and distribution of a Software that does not belong to it.

Seventh Affirmative Defense – Failure to Mitigate Damages

35.     MAX hereby reincorporates and re-alleges all the preceding paragraphs of its Affirmative and Other Defenses as if fully set forth herein.

36.     TEG's claims are barred, in whole or in part, because TEG has failed to take reasonable actions to mitigate its alleged damages.

37.     TEG has not taken reasonable action to mitigate any actual or perceived damages that resulted from its allegation that MAX never provided TEG with a working software, which MAX denies.

38.     MAX first supplied TEG with software in 2020 and despite alleging that it has never received a working version of the software, took no action until the instant lawsuit was filed, to mitigate the damage allegedly caused by MAX's failure to provide a working version of the software.

Eighth Affirmative Defense - Offset

39.     TEG's claims are barred, in whole or in part, because recovery, while not warranted under the facts or law of this case, would also be offset by sums owed by TEG to MAX.

28
**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

<u>Ninth Affirmative Defense – Contractual Estoppel</u>

40.     Subsequent to the signing of the Joint Venture Agreement, TEG and MAX entered into the Source Code License Agreement and End User License Agreement.

41.     Count I of TEG's complaint for Declaratory Judgement is barred, in whole or in part, because the Source Code License Agreement and End User License Agreement provide that MAX is the sole and exclusive owner of its software.

<u>Tenth Affirmative Defense – Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

42.     MAX hereby reincorporates and re-alleges all the preceding paragraphs of its Affirmative and Other Defenses as if fully set forth herein.

43.     TEG's claims are barred, in whole or in part, because TEG breached the implied covenant of good faith and fair dealing in its performance of the Joint Venture Agreement.

## FIRST AMENDED COUNTERCLAIMS

1.     Defendant, Max Minds, LLC ("MAX" or "Defendant"), by counsel, for its Amended Counterclaims against Triangle Experience Group, Inc. ("TEG" or "Plaintiff" or "Counter Defendant"), states the following:

## PARTIES

2.     MAX is an Indiana limited liability company, with its principal place of business in Carmel, Indiana and an address of 12400 North Meridian Street, Suite 175 Carmel, IN 46032. MAX creates cutting edge software platforms for commercial and governmental applications. MAX's sole member is Brandon Fischer ("Mr. Fischer") who is domiciled in Indiana. Mr. Fischer is also MAX's CEO and founder.

3.     TEG is a Virginia stock corporation with its principal place of business at 11182 Hopson Road, Suite A, Ashland, VA 23005. TEG is a reseller of military technology created by other companies. The President and CEO of TEG is Rob Clare.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

## JURISDICTION AND VENUE

4.      This  Court has subject matter jurisdiction over MAX's counterclaims under 28 U.S.C. § 1367(a) because they are so related to TEG's claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has subject matter jurisdiction over MAX's counterclaims pursuant to 28 U.S.C. §1332(a)(1) because this matter involves claims between citizens of different states where the amount in controversy exceeds $75,000.

6.      This Court has supplemental jurisdiction over any of MAX's remaining counterclaims arising under the laws of Indiana pursuant to 28 U.S.C. § 1367(a) because these claims are so related to MAX's claims under 28 U.S.C. §1332(a)(1) that they form part of the same case or controversy and derive from a common nucleus of operative facts.

7.      This Court has personal jurisdiction over TEG because TEG waived any objection to this Court's personal jurisdiction when it agreed to the forum/venue selection clauses of the EULA and SCLA. The EULA and SCLA were agreed to by both parties and include clauses that designate Indiana as the proper venue for any case or controversy arising from the EULA or SCLA. The SCLA further designates Indiana as the proper venue for any controversy relating to the SCLA.

8.      This Court also has personal jurisdiction over TEG because, among other things (i) this case arises out of agreements made or to be performed in Indiana and (ii) TEG has derived substantial revenue from goods and/or services rendered in Indiana and from interstate commerce.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because TEG "resides" in the Southern District of Indiana given that TEG is subject to personal jurisdiction in this District. Additionally, venue is proper in this Court pursuant to 28

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.

## FACTUAL ALLEGATIONS

**A.  MAX's founder, Brandon Fischer, is a successful innovator and entrepreneur.**

10.     Mr. Fischer is a software developer and entrepreneur who lives in Carmel, Indiana.

11.     In 2005, Mr. Fischer founded and served as CEO of a software development company called Anacore. In 2010, Anacore created a software platform called "Synthesis" that proved to be a valuable product.

12.     In 2014, Anacore was acquired by Silicon Valley company Prysm. Through this acquisition Prysm gained ownership of the Synthesis source code. Following the acquisition, Mr. Fischer was made the Vice President of Research and Development of Prysm.

13.     On March 1, 2018, Mr. Fischer left Prysm and, on May 3, 2018, founded MAX as an Indiana company. Fischer founded MAX initially as an entity through which he could perform some consulting work with Prysm but MAX later began developing software on its own and bringing products to market.

**B.  MAX independently created and marketed the Haptic platform in 2019.**

14.     In or around March 2019, MAX began development of a software product called "Haptic," with full-time development beginning in May 2019. Haptic is an interactive content collaboration software and was originally designed for use in both the public and private sector. MAX created Haptic independently.

15.     Haptic enables teams to communicate seamlessly and in real-time. The platform's powerful tools help teams manage tasks, share files, and stay organized. The software

is capable of numerous functions such as creating: Briefing and experience centers; ideation and insight centers; customizable collaboration spaces; and dashboarding and operations centers.

16.     In June 2019, MAX demonstrated Haptic to industry partners and potential commercial customers at InfoComm.

17.     In July 2019, MAX conducted another demonstration of the Haptic platform to industry partners and potential customers. MAX demonstrated Haptic to at least a dozen individuals during that demonstration. The demonstration resulted in the first license of Haptic to a government agency in August 2019 through MAX's first licensing partner.

18.     On or about October 1, 2019, MAX published a video demonstration of Haptic showing a highly functional product. The video demonstration can be viewed at this URL: https://vimeo.com/363671367/409066cb0e.

19.     In or about November 2019, Mr. Fischer installed Haptic for the first licensee, U.S. government agency. MAX had a fully functioning version of Haptic at this time.

### C.  MAX requires licensees to agree to an End User License Agreement to protect MAX's intellectual property.

20.     Prior to installing the Haptic software on any licensee systems, all users and licensees must accept the terms provided in an End User License Agreement (the "EULA").

21.     TEG requested that MAX make TEG a user of the Haptic software.

22.     In consideration for allowing MAX to be a user of the Haptic software, TEG agreed to comply with the EULA.

23.     TEG is a "user" to which the EULA applies.

24.     TEG is a licensee to which the EULA applies.

25.     The EULA was presented to TEG in a manner that was reasonably conspicuous.

26.     TEG manifested its asset to the EULA and its intent to be bound by the EULA.

27.     TEG's assent to the EULA was unambiguous.

28.     TEG agreed to be bound by the EULA.

29.     TEG agreed and intended to be an end user of the Haptic software.

30.     The terms of the EULA are consistent with the status of TEG as a user and licensee of the Haptic software.

31.     When TEG agreed to be bound by the EULA, TEG also explicitly agreed to be bound by the terms of the Haptic Privacy Policy, attached herewith as Exhibit 5.

32.     The EULA uses the term "Product" defined as "the Haptic application, software, their associated upgrades, patches, and updates and related services (the 'Product') currently provided or which will be provided by Max Minds, LLC dba Haptic, or any one of its subsidiaries or affiliated companies (collectively referred to as 'HAPTIC')." Ex. 2, at 1.

33.     Section 1 of the EULA ("Grant of License") states, in part: "HAPTIC (or its licensors) grants You a non-exclusive, non-transferable, non-sublicensed, non-commercial and personal license to install and/or use the Product . . . for such time until either You or HAPTIC terminates this EULA. THIS PRODUCT IS LICENSED TO YOU, NOT SOLD." Ex. 2, § 1.1.

34.     Section 1 of the EULA goes on to specify: "You shall not, directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product (except if the Product enables You through a specific feature to create, generate or submit User Generated Content and for which You will need to create an Account and comply Terms of Use), in whole or in part; (iii) create, use and/or distribute 'auto', 'trainer', 'script' or 'macro' computer programs or other 'cheat' or 'hack' programs or software applications for this Product (whether over the internet or in local area network); (iv) remove,

alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." Ex. 2, § 1.2.

35.     Section 2 of the EULA ("Ownership") states: "All title, ownership rights and intellectual property rights in and to the Product [ ] and any and all copies thereof are owned by HAPTIC or its licensors. This License confers no title or ownership in the Product and should not be construed as a sale of any rights in the Product." Ex. 2, § 2.

36.     The EULA is governed "in accordance with the laws of the United States and the State of Indiana." Ex. 2, § 9.4.1. The EULA contains a forum/venue selection clause stating, "any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana[.]" Ex. 2, § 9.4.2.

37.     TEG has manifested its assent and agreed to be bound by the EULA numerous times.

38.     TEG manifested its assent and agreed to be bound by the EULA in connection with installations of Haptic or Haptic branch products.

39.     TEG's CEO Rob Clare acknowledged acceptance of the terms EULA in an email dated August 10, 2020.

40.     The EULA does not conflict with the terms of any other agreement between the parties including the JVA.

41.     The EULA is binding on TEG.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

**D. TEG business practices exploit software development companies.**

42.     TEG is a software distributor that represents itself as specializing in providing software to the U.S. Government.

43.     TEG improperly rebrands the third-party software it licenses to the government under "C4MAP" which is an acronym for "Comprehensive Collaborative Command and Control Mission Application Platform." TEG also uses "VJOC," an abbreviation for Virtual Joint Operations Center, when supplying third-party software to the government.

44.     By using the "C4MAP" brand, TEG can switch out the underlying software platform without notifying customers, including the U.S. government, simply by adjusting the version number. Further, the brand name obfuscates the fact that the partner company actually creates and develops the software.

45.     TEG also uses the "C4MAP" brand to negotiate more favorable deals with the U.S. government by presenting itself as the sole provider of C4MAP in order to obtain sole-source contracts with premium prices due to the absence of alternative providers.

46.     In 2016, TEG began working with software company Hadron Industries, Inc. ("Hadron"). That relationship appears to have broken down and, as alleged in a 2018 lawsuit filed by Hadron against TEG, 1:19-cv-00035 E.D.Va., TEG rebranded Hadron's product without permission and called it "C4MAP 1.0". In the 2018 lawsuit, Hadron alleged unfair business practices, tortious interference with business relations and prospective advantage, violations of the Lanham Act, conspiracy, breach of contract, breach of the covenant of good faith and fair dealing, commercial disparagement, defamation, conversion, and unjust enrichment.

**E. TEG sought out MAX to be its new partner.**

47.     Mr. Fischer met TEG in 2016 in connection with TEG operating as a licensed distributor of Prysm's Synthesis software.

48.     In or about March 2018, less than 3 weeks after Mr. Fischer departed from Prysm, TEG initiated contact with Mr. Fischer by phone and inquired about working with Mr. Fischer. TEG was aware of Mr. Fischer's involvement in the development of the Synthesis software and, notwithstanding its knowledge of Prysm's ownership of the Synthesis software, asked Mr. Fischer if he could make modifications to the Synthesis source code.

49.     In response, Mr. Fischer indicated that he was subject to a Non-Compete Agreement with Prysm at the time. Mr. Fischer advised TEG that to work together prior to the expiration of the Non-Compete Agreement, TEG would first need to (1) license the source code from Prysm, and (2) obtain permission from Prysm for Mr. Fischer to collaborate with TEG.

50.     A few months after the expiration of the Non-Compete Agreement in February 2019, Mr. Fischer invited TEG to the above-referenced July 2019 demonstration of Haptic. TEG declined the invitation and instead invited MAX to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia.

51.     The purpose of the meeting at the Joint Staff Lab was for MAX to demonstrate the Haptic platform to TEG and leaders within the Joint Staff Lab, i.e., potential customers. Prior to this demonstration, MAX and TEG entered into a mutual Non-Disclosure Agreement ("NDA"), attached herewith as Exhibit 4.

52.     Unbeknownst to MAX, the demonstration at the Joint Staff Lab fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract and TEG used the demonstration to pitch the government for an additional contract award. On July 25, 2019, a week after the demonstration, TEG received a $16.6 million contract award. The contract award is described as "Cross Domain Solutions- Comprehensive, Collaborative, Command and

Control Mission Application Platform Service" which is longhand for C4MAP. TEG did not disclose the existence of either the sole-source contract or the contract award to MAX.

53.       Unaware of TEG's exploitation of Mr. Fischer's presentation, MAX continued to develop the Haptic product independently. There was no collaboration between TEG and MAX with respect to developing Haptic.

54.       On October 2, 2019, Mr. Fischer provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic user accounts.

55.       On behalf of TEG, Clare and Mase consented to the EULA in order to utilize the Haptic user accounts allocated to them and TEG.

56.       The Haptic user accounts allowed TEG to access and demonstrate the Haptic platform live to their customers.

57.       Before signing-in, TEG acknowledged and assented to the terms of the EULA and the Haptic Privacy Policy attached herewith as Exhibit 5.

58.       . Impressed with Haptic's capabilities, Rob Clare contacted Mr. Fischer on November 3, 2019, to discuss how TEG could become an authorized reseller of the Haptic software to the U.S. Government. TEG requested a meeting and Mr. Fischer met with TEG later that month. TEG then requested that MAX visit TEG in January 2020, and offered to pay for MAX's entire trip including expenses, which MAX accepted.

**F. MAX and TEG executed the Joint Venture Agreement under which TEG would manage a distribution channel to the federal government for MAX's Haptic Federal product.**

59.       For at least six months in 2019, MAX had been marketing Haptic to commercial entities and the U.S. government.

60.       On January 23, 2020, MAX and TEG entered into the Joint Venture Agreement (the "JVA") attached hereto as Exhibit 1.

61.      The JVA stated that MAX would "[c]reate and maintain a branch of the Haptic source code, called Haptic Federal" that would be "for exclusive use by the US government." Ex. 1, at 1. The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]" Id. at 2. The JVA pertains to the Haptic Federal product only.

62.      Both Haptic and Haptic Federal continued to evolve independently in parallel. MAX is the sole owner of the copyrights in the Haptic and Haptic Federal software, including all versions of both Haptic and Haptic Federal.

63.      Haptic Federal is a server-based collaborative workspace that utilizes a browser interface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit users to select and share the display window of individual programs from their workstations to the Haptic Federal workspace. Haptic Federal is an infinite canvas of screen real estate that operates synchronously for all members in real-time. Haptic Federal is both the front-end operating system and underlying source code that is responsible for delivering these capabilities.

64.      Haptic Federal offers substantial benefits, and its capabilities are highly regarded within the defense community.

65.      Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements." Id. at 1. TEG was required to "establish and manage all federal channel sales partnerships." Id. at 3.

66.      Although TEG was to manage the federal distribution channel, the JVA required "TEG and Max [ ] to establish and share an electronic files system." Id. at 2. Specifically, "TEG

and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]" Id. "TEG and MAX agree[d] to conduct routine project and program management review discussions." Id.

67.     Additionally, the JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. Id. at 1. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months. Id. Nothing in the JVA granted TEG ownership rights in the Haptic Federal software.

68.     With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]" Id. at 3. However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue." Id.

69.     Notably, the JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software.

70.     MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." Id. However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred. Id. at 2.

**G. From the start of their relationship, TEG lied to MAX and concealed material information.**

71.     TEG's conduct, most or all of which was unknown to MAX at the time, indicates TEG's intent to skirt its contractual obligations and the law from the start.

72.     Unbeknown to MAX, after TEG and MAX signed the JVA in January 2020, TEG used the Haptic Federal software to fulfill commitments that TEG had previously made to the U.S. Government. Said commitments arose out of a $49.5 million sole source contract, awarded to TEG in 2016 and ending in October 2021.

73.     TEG did not disclose the existence of MAX as the software provider in the contracts that TEG signed and executed with the federal government customer(s) pursuant to this sole source contract. Instead, TEG presented itself as the sole owner and developer of the software.

74.     Part of TEG's overall scheme to position itself as the sole source of the product was to engage in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names. TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC," removing the Haptic trademark. This made it easier for TEG to misrepresent Haptic Federal to industry partners and customers as its own creation.

75.     For example, TEG replaced product trademarks on the platform with TEG's own VJOC logo. TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the U.S. Army shops for commercial information technology ("IT") software and services. Similarly, TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore. TEG also promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org.

76.     Additionally, TEG improperly marketed MAX's intellectual property as its own in various bid proposals submitted to the Government. TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

77.     It was not until MAX confronted TEG in March 2020, that TEG agreed that it would always call the product "C4MAP powered by Haptic." Despite this agreement, TEG later reverted to leaving out any reference to Haptic or MAX when marketing the product.

78.     TEG also lied about and concealed critical information about sales of the Haptic Federal product.

79.     Unbeknownst to MAX, TEG has been profiting from the installation and support of Haptic Federal at Army bases throughout the U.S. since the first year of the JVA. TEG received payments from the U.S. Government, totaling over $5.28 million in 2020 alone, none of which TEG disclosed to MAX. TEG remitted less than 10% of that amount to MAX in year 2020.

80.     TEG was contractually bound by the JVA to make timely payments to MAX each year. In fact, the JVA provision granting TEG exclusivity was contingent upon MAX receiving minimum (license-based) revenue targets that escalated each year. Starting in 2021, TEG did not meet any of the sales targets set forth on page 2 of the JVA because it did not report relevant sales to MAX and pocketed the money owed to MAX.

81.     TEG's failure to meet license sales targets was surprising to MAX because, pursuant to the JVA, MAX referred several potential license opportunities of Haptic Federal to TEG. Most of these referrals occurred in 2020.

82.     In reliance that TEG was acting in good faith, MAX continued its relationship with TEG. When MAX asked TEG about 2020 payments, TEG claimed it was "waiting on the government."

**H. In early 2021, MAX and TEG executed a Source Code License Agreement reiterating MAX's ownership rights to Haptic Federal and setting licensing parameters.**

83.     On March 30, 2021, MAX and TEG entered into the Source Code License

Agreement (the "SCLA"), attached herewith as Exhibit 3.

84.     The subject of the SCLA is source code. Source code is different from object

code. The EULA concerns the licensing and use of object code.

85.     Both the EULA and SCLA provide that MAX is the sole owner of the Haptic

Federal software.

86.     The SCLA is supported by consideration in the form of MAX's agreement to

share the source code for Haptic with TEG.

87.     The consideration in the form of MAX's agreement to share source code for

Haptic is incredibly valuable consideration because the source code for Haptic is a trade secret of

MAX and extremely valuable.

88.     There was no preexisting obligation on MAX to share source with TEG prior to

the execution of the SCLA.

89.     The JVA does not obligate MAX to provide source code to TEG.

90.     The JVA does not require any source code disclosure to TEG whatsoever.

91.     All of the requirements in the JVA as it pertains to software development could

be performed by MAX alone without disclosing any source code to TEG whatsoever.

92.     MAX's agreement to provide source code pursuant to the SCLA was by itself

and alone sufficient present consideration to support the SCLA.

93.     In the SCLA, MAX granted TEG "a non-exclusive, non-sublicensable, and non-

transferrable [ ] license" for Haptic Federal. Ex. 3, § 2(a). The license was "[s]ubject to and

conditioned on [TEG's] payment of Fees and compliance with all the terms and conditions of

[the SCLA]." Id. Moreover, the SCLA "supersede[d] all prior and contemporaneous [agreements] with respect to [the subject matter of the SCLA.]" Id. at § 12(a).

94.     The SCLA lays out multiple "Use Restrictions" on TEG's license: [TEG] "shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party; (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law." Id. at § 2(b).

95.     With respect to intellectual property ownership, the SCLA provides that "as between [TEG] and [MAX], [MAX] owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation." Id. at § 7(a).

96.     Likewise, the SCLA provides that MAX is the sole owner of any and all "Feedback" (i.e., "comments, questions, suggestions") that TEG or any other user may provide. Id. at § 7(b).

97.     The SCLA is governed by Indiana law and includes a forum/venue selection clause mandating that "[a]ny legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States in Indiana or the courts of the State of Indiana located in the City of Carmel and County of Hamilton[, Indiana.]" Id. at § 12(f).

98.     The SCLA was a binding agreement on MAX that MAX performed by disclosing the Haptic federal source code to TEG.

99.      The SCLA was a binding agreement on TEG that TEG agreed to abide by when it entered into the SCLA and when it received source code from MAX under circumstances demonstrating the parties' agreement to be bound by the terms of the SCLA.

100.     The SCLA was not illusory or an "agreement to agree" because without the SCLA, MAX would never have disclosed its source code to TEG.

101.     MAX provided formal notice of termination of the SCLA in August 2023, the SCLA had terminated earlier due to failures in fee structure negotiations required by Exhibit A, Section 3 of the SCLA.

102.     Section 11(d) of the SCLA states "this section 11(d) and Sections 1, 5, 6, 7, 8, 9, 10, and 12 survive any termination or expiration of this Agreement."

**I.  Due to TEG's consistent misconduct, MAX and TEG's relationship had turned for the worse by the end of 2022.**

103.     Despite MAX already having compromised and allowing TEG to market Haptic Federal as "C4MAP powered by Haptic," TEG continued with its unauthorized rebranding campaign. MAX again confronted TEG about the issue on May 26, 2021, via email.

104.     Due to TEG's false and misleading statements to potential customers, MAX felt it had to remind TEG that "TEG is not the exclusive provider, licensor or distributor of the Haptic (source code). MAX has provided TEG with a temporary license to the source code for a limited time[.]" Further, MAX made it clear that TEG should not be selling or offering to sell perpetual licenses of the product. Finally, MAX pointed out "numerous instances where C4MAP or VJOC are mentioned without the phrase 'Powered by Haptic.'"

105.     Unfortunately, TEG did not change course and, instead, simply concealed more of its improper conduct from MAX.

106.     TEG's rebranding of Haptic Federal in their marketing and license sale materials has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers.

107.     In addition, in 2020-2021, TEG misused software licenses by providing supposedly free extended trials. MAX had explained to TEG that "[e]ach 'Free Trial' must be authorized by Max/Haptic in-advance of installation." Yet in mid-2021 MAX discovered a dozen trials that TEG had extended to customers without authorization. While TEG told MAX these were free trials, it is highly likely TEG was being paid to install and support these trial installations.

108.     Further, TEG provided unauthorized trials by misusing the two software licenses that were given to TEG under the JVA for demo and testing purposes. TEG replicated the unauthorized licenses for live events and live exercises for which it received compensation. TEG also misused software licenses purchased from MAX by replicating the licenses numerous times for customers without MAX's authorization.

109.     During a call on May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy. These actions demonstrate a deliberate attempt to avoid compliance with the various agreements between MAX and TEG and have led to financial losses for MAX.

110.     For other customers, TEG misrepresented the terms of the licenses they sold by falsely characterizing them as perpetual licenses. This misrepresentation led end customers to believe they were purchasing a perpetual license when, in fact, they were only acquiring annual licenses for MAX's software.

111.     As a result of this misrepresentation, end customers were misled into making purchasing decisions based on false information, which caused financial harm and confusion among the customers.

112.     In late 2021, the MAX team explained the importance to TEG of providing documented customer use case and requirements so that MAX could improve their release Test Plan and avoid bugs in future releases. In fact, the JVA requires that "TEG will deliver, deploy, sustain and develop customer requirements." Ex. 1, at 1. The MAX team also emphasized to TEG the need to conduct testing of their own and, if necessary, provide feedback to MAX before upgrading the software at the customer site. Unfortunately, TEG simply did not provide the critical feedback or perform the testing that MAX identified.

113.     The JVA also required TEG to "maintain a web presence for marketing material of the Haptic Federal product." But TEG waited 34 months, until November 2022, to update their website and begin to publicly promote the product offering.

114.     Unbeknownst to MAX, TEG was also concealing discounts that it provided to customers. Under the JVA, discounts were to be subtracted from TEG's share of the revenue. Ex. 1, at 3. By concealing discounts, TEG deprived MAX of payments that it was owed under the JVA.

115.     For example, one invoice from December 3, 2021, included a 50% discount. Under the JVA, a 50% discount should result in all revenue flowing to MAX. TEG concealed the discount from MAX and consequently concealed information MAX needed to understand the proper allocation of revenues.

116.     TEG continued to conceal sales in 2021. When it failed to meet the 2021 revenue target, based upon the sales information reported to MAX, TEG claimed it was "waiting

on the government" to receive funds. In reality, TEG received payments from the U.S. Government, totaling over $2.41 million in 2021. TEG remitted less than a third of that amount as license-based revenue to MAX.

117.     Believing that TEG was acting in good faith, MAX allowed TEG to make a $385,000 payment to MAX to reach the minimum target in 2021 and MAX and TEG continued their relationship.

118.     A year later, at the end of 2022, TEG was $1.8 million short of the JVA's revenue target. Ex. 1, at 2. MAX and TEG attempted to renegotiate the terms of their agreements, including the JVA, and remove the revenue targets from the JVA that were required for exclusivity. No agreement was reached to modify the JVA terms.

119.     Because TEG was still in breach of the JVA, MAX proposed an alternative whereby TEG would count the $1.8 million payment toward pre-purchase licenses. This way, TEG could retain its exclusivity into 2023. TEG refused this offer.

120.     Despite not having previously claimed that issues with the Haptic Federal software were preventing sales, TEG then began making such assertions. In one such assertion TEG stated, "how can you expect us to pay for licenses when you've never given us a product that works."

121.     Given that TEG refused to agree to any reasonable alternative, ultimately, MAX demanded a $1.8 million makeup payment for TEG to remain the exclusive reseller of Haptic Federal, although the JVA required the money to come from license sales revenue. TEG eventually sent $1.8 million payment on February 14, 2023.

122.     Notwithstanding its assertions that the Haptic Federal software was "unsellable," TEG was in fact able to sell licenses of Haptic Federal. Public records show that TEG sold at

least $2.5 million of Haptic Federal licenses in 2022. MAX also knows, based on the license

sales TEG did disclose, that TEG sold at least $3.8 million of Haptic Federal licenses in 2022. It

is unclear whether the license sales disclosed by public records are included with, or in addition

to, the license sales disclosed by TEG in 2022.

### J. TEG escalated its inappropriate behavior in 2023, leading to the end of the partnership.

123.    Throughout 2023, it became increasingly difficult for MAX to work with TEG

as TEG's behavior grew increasingly outrageous.

124.    On January 10, 2023, an issue arose during a test of the Haptic Federal product.

TEG attempted to blame MAX for the issue, but the problem resulted from TEG's failure to

follow MAX's instructions for using the product. TEG had attempted to test the product with

over 140 users signed in simultaneously, with audio enabled, and multiple live screen shares

occurring simultaneously. MAX had previously notified TEG that such a high level of

concurrent usage far exceeded the intended capabilities of the Haptic Federal software.

125.    On January 26, 2023, TEG again failed to follow MAX's instructions regarding

proper use of the product. During a dress rehearsal for a full Department of Defense exercise,

TEG allowed as many as 400 users to sign in simultaneously. TEG's failure to follow MAX's

instructions for use of the product resulted in a degradation in performance which reflected

negatively on the Haptic Federal product.

126.    The JVA contains an annual renewal requirement for customers to maintain

access to Haptic Federal, in addition to receive continued support and software upgrades. Ex. 1,

at 2. MAX reminded TEG in November 2021 that support for customer licenses would expire

after 12 months if customers did not renew. In February 2023, TEG told MAX that all customers

decided not to renew their support, but TEG has continued to support these customers and has

improperly retained the undisclosed support revenue for itself. MAX is owed its proper share of the renewal fees for any licenses TEG has continued to support.

127.     TEG also started referring to itself as "co-manufacturer" of the product to third parties despite MAX being the sole owner of all rights in the Haptic Federal software.

128.     TEG's violations of the parties' agreements are extensive. For example, on calls TEG personnel have referred to U.S. Special Operations Command (SOCOM) as a paying customer but TEG has not purchased licenses for SOCOM nor has TEG paid any fees to MAX for any license to SOCOM.

129.     TEG has also made false and damaging statements about Mr. Fischer and MAX to customers and industry partners.

130.     TEG incorrectly told third parties that Mr. Fischer and MAX were to blame for perceived deficiencies with the product. As discussed supra, TEG falsely described itself as a creator and developer of the product. TEG also misrepresented the history of the parties' relationship, falsely asserting that Mr. Fischer initially inquired about providing Prysm's source code to power C4MAP in violation of his non-compete agreement with Prysm. TEG's false statements have caused harm to Mr. Fischer's reputation and MAX's business interests.

131.     On May 9, 2023, via phone, TEG repeated to MAX its new narrative that it did not have a product that it could sell. This was patently false. In fact, public records show that TEG secured a $721,000 license sale the following day.

132.     In 2023, TEG generated at least $2.5 million dollars of revenue by selling new licenses and providing support for Haptic Federal. According to public records, TEG generated even more sales in 2023 than it did in 2022. TEG did not disclose these sales to MAX.

133.    TEG was awarded a new 5-year, sole-source, $49.5M government contract in March 2022 that runs from 2022-2027.

134.    Contrary to TEG's assertions that the Haptic Federal product did not work, every software release of Haptic Federal met the requirements outlined in the JVA and passed the version of the software Test Plan that was applicable at the time.

135.    There have been over 30 software updates of Haptic Federal since the signing of the JVA, each containing numerous updates and improvements. This far exceeds the 16 software updates required under the JVA. Ex. 1, at 1.

136.    TEG's failure to comply with the terms of the JVA has hampered development of additional functionality for the Haptic Federal product. In accordance with TEG's obligation under the JVA to "develop customer requirements," MAX has consistently asked TEG to document the customer requirements and use case(s) so that MAX can be even more proactive and identify bugs/issues before every software release. Ex. 1, at 1. TEG has consistently failed to provide a thorough Test Plan.

137.    TEG has installed new software releases at customer sites prior to TEG's own testing and validation resulting in performance issues, which reflect negatively on the Haptic Federal product. MAX could have ameliorated the effects of TEG's reckless behavior if TEG had not acted in violation of the JVA. The JVA requires that the instances of Haptic Federal provided to TEG by MAX "will be installed in the TEG commercial data center . . . and access will be given to MAX personnel." Ex. 1, at 2. TEG failed to give access to MAX.

138.    In addition to the foregoing issues, avoidable software failures that may have occurred between 2020-2023 were a result of one or more of the following: (1) TEG's failure to inform MAX of new customer requirements, prior to a software release; (2) TEG allowing end

customers to use the software beyond its designed and intended capabilities; (3) TEG's failure to properly train end users; (4) variables within the customer environment, such as poor network conditions, that were outside of MAX's control; and/or (5) TEG's failure to thoroughly test new releases prior to installing into the customer requirement.

139.     TEG even promised customers "vaporware," i.e., features of Haptic Federal that were not ready for customer use. For example, TEG promised customers "JWICS" (Joint Worldwide Intelligence Communication System) functionality without any input or involvement from MAX. MAX had never indicated or even suggested to TEG that JWICS functionality was ready to be part of an upcoming release.

140.     Because TEG overpromised functionality to customers, those customers expressed their unhappiness to TEG. To the extent that TEG did disclose MAX's involvement, TEG lied and blamed MAX for any deficiencies.

141.     TEG also failed to protect the Haptic Federal Source Code. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. In most cases, TEG provided MAX with a "chain of custody" document that should have signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan. In the summer of 2023, TEG failed to provide chain of custody documentation multiple times.

142.     As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The Certification Agreement is attached as Exhibit 6. The agreement was intended to formalize confidentiality safeguards for Haptic Federal.

143.     The Certification Agreement mandates that "all copies of the Source Code that have been provided to TEG and/or to a TEG customer have been destroyed, and have not been retained by any entity." Ex. 6, ¶ 2. Further, the Certification Agreement mandates that "TEG shall secure from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)." Id., at ¶ 3.

144.     TEG has repeatedly violated the terms of the Certification Agreement. For the two most recent source code transfers (3.1.21.8 and 3.1.21.9) on September 13 and September 22, 2023, respectively, TEG has (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code.

145.     MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. TEG has willfully endangered the Haptic Federal source code, resulting in damage to MAX.

146.     It is unsurprising that TEG failed to protect the source code from unauthorized distribution or tampering since TEG itself has tampered with the source code. As discussed above, TEG made at least over $5 million of software/service sales using Haptic Federal in 2022 and 2023 that TEG never disclosed to MAX. In each case, TEG would need a license key to install the software. To get around this requirement, TEG has backdated computers to circumvent the licensing logic and/or retained and modified the Haptic Federal source code by stripping or modifying the licensing logic to provide the software to those new customers.

147.     Evidence of TEG's modification of the source code is shown in Exhibit 7 which is a screenshot of a login page for the "VJOC" software, identical to the Haptic Federal login except that it is rebranded as "VJOC", and shows a version number of 3.1.21.13. On information

and belief, TEG copied a version of the Haptic Federal source code from late 2022 or 2023 and has created a number of derivative works in the form of version releases including, but not limited to, 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

148.    On information and belief, TEG is licensing these unauthorized derivative works of the Haptic Federal source code to fulfill ongoing federal contracts.

## <u>COUNT I</u>
### (Breach of Contract – Source Code License Agreement)

149.    MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the counterclaim as if fully set forth herein.

150.    MAX entered into a Source Code License Agreement in connection with its business relationship with TEG. The Source Code License Agreement constitutes a valid and enforceable contract.

151.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Source Code License Agreement by various acts and omissions including, without limitation, the following:

a.   Misusing software licenses provided by MAX.

b.   Falsely characterizing license sales to customers as perpetual licenses.

c.   Tampering with and/or modifying a version of the Haptic Federal source code released in early 2023 or early 2022 to create at least five subsequent derivative works including versions 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

d.   Retaining the Haptic Federal source code in violation of its obligation to delete that software.

e.   Replacing logos in Haptic Federal with TEG's logos.

    f.   Engaging in unauthorized and/or illegal license distribution and circumventing the license key requirement of Haptic Federal.

152.    MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the Source Code License Agreement.

153.    As a direct and proximate result of TEG's breach of the Source Code License Agreement, MAX has been damaged in an amount to be proven at trial.

154.    MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

## COUNT II
### (Breach of Contract – End User License Agreement)

155.    MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the counterclaim as if fully set forth herein.

156.    MAX entered into an End User License Agreement in connection with its business relationship with TEG. The End User License Agreement constitutes a valid and enforceable contract.

157.    TEG has breached the terms, covenants, promises, provisions, and warranties of the End User License Agreement by various acts and omissions including, without limitation, the following:

    a.   Misusing software licenses provided by MAX.

    b.   Falsely characterizing license sales to customers as perpetual licenses.

    c.   Tampering with and/or modifying a version of the Haptic Federal source code to create derivative versions including, but not limited to, 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

    d.  Retaining the Haptic Federal source code in violation of its obligation to delete that software.

    e.  Removing, altering, disabling or circumventing any copyright and trademark indications.

    f.  Replacing logos in Haptic Federal with TEG's logos.

    g.  Engaging in unauthorized and/or illegal license distribution and circumventing the license key requirement of Haptic Federal.

158.    MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the End User License Agreement.

159.    As a direct and proximate result of TEG's breach of the End User License Agreement, MAX has been damaged in an amount to be proven at trial.

160.    MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

<u>**COUNT III**</u>
**(Breach of Contract – Joint Venture Agreement)**

161.    MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the counterclaim as if fully set forth herein.

162.    MAX entered into a Joint Venture Agreement in connection with its business relationship with TEG. The Joint Venture Agreement constitutes a valid and enforceable contract.

163.    TEG has breached the terms, covenants, promises, provisions, and warranties of the Joint Venture Agreement by various acts and omissions including, without limitation, the following:

    a.  Failing to meet revenue targets, paid to MAX, in 2021, 2022, and 2023.

b.  Failing to create a distribution channel for Haptic Federal to the federal government.

c.  Failing to deliver, deploy, sustain and develop customer requirements.

d.  Failing to maintain a web presence for marketing material of the Haptic Federal product.

e.  Providing discounts and failing to subtract the discount amount from TEG's share of revenue.

f.  Providing support to customers that had not renewed licenses and retaining all of that revenue.

g.  Failing to give MAX personnel access to TEG's commercial data center.

h.  Failing to share an electronic files system.

i.  Failing to work collaboratively with MAX on the preparation and delivery of proposals, marketing materials, and activity reporting to government customers.

j.  Engaging in unauthorized and/or illegal license distribution.

k.  Misusing licenses of Haptic Federal and circumventing the license key requirement of Haptic Federal.

164.   MAX has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to MAX's right to recover under the Joint Venture Agreement.

165.   As a direct and proximate result of TEG's breach of the Joint Venture Agreement, MAX has been damaged in an amount to be proven at trial.

166.   MAX also seeks its attorneys' fees and costs, to the extent they are allowable by law or by contract.

## COUNT IV
### (Breach of Contract – Certification Agreement)

167.     MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the

counterclaim as if fully set forth herein.

168.     MAX entered into a Certification Agreement in connection with its business

relationship with TEG. The Certification Agreement constitutes a valid and enforceable contract.

169.     TEG has breached the terms, covenants, promises, provisions, and warranties of

the Certification Agreement with respect to the source code transfers for Haptic Federal versions

3.1.21.8 and 3.1.21.9 by, among other things, retaining the source code, withholding the

government scan report, withholding Chain of Custody documents, and failing to obtain

signatures from everyone who touched the code.

170.     TEG has breached the terms, covenants, promises, provisions, and warranties of

the Certification Agreement by tampering with and/or modifying a version of the Haptic Federal

source code released in early 2023 or late 2022 to create at least five subsequent versions

including 3.1.21.9, 3.1.21.10, 3.1.21.11, 3.1.21.12, and 3.1.21.13.

171.     MAX has fully performed its contractual obligations to TEG and satisfied all

conditions precedent, if any, to MAX's right to recover under the Certification Agreement.

172.     As a direct and proximate result of TEG's breach of the Certification

Agreement, MAX has been damaged in an amount to be proven at trial.

## COUNT V
### (Common Law Fraud)

173.     MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the

counterclaim as if fully set forth herein.

174.     TEG made false and material representations, misrepresentations and omissions

to MAX including, without limitation, the following:

    a.   In the years 2020, 2021, 2022, and 2023, TEG represented to MAX that it received a certain amount of revenue from sales of Haptic Federal.

    b.   In the years 2020 and 2021, TEG represented to MAX that TEG was "waiting on the government" for significant amounts of revenue from sales of Haptic Federal.

    c.   In late 2022 and throughout 2023, TEG stated that MAX had never given TEG a product that works, and relatedly, TEG stated that Haptic Federal was unsellable.

    d.   In August 2023, TEG misrepresented to MAX that none of the source code TEG previously received had been copied and all copies TEG previously received were destroyed.

175.    Representation (a) above was false and when it was made TEG knew it was false. The amount of revenue from sales of Haptic federal that TEG received was materially higher than the amount represented.

176.    Representation (b) above was false and when it was made TEG knew that it was false. TEG was not "waiting on the government" for revenue from sales of Haptic Federal. In fact, TEG had received revenue and simply chose to conceal this fact from MAX.

177.    Representation (c) above was false and when it was made TEG knew that it was false. TEG knew that Haptic Federal worked and TEG knew it could sell Haptic Federal. TEG knew this because TEG had in fact sold Haptic Federal to the government, a fact it concealed from MAX.

178.    Representation (d) above was false and when it was made TEG knew that it was false. TEG had copied and is currently licensing a version of Haptic federal that is based on the

source code MAX shared with TEG pursuant to the SCLA, a fact that TEG concealed from MAX.

179.    TEG intended that MAX rely on each and every representation, misrepresentation, and omission above when they were made.

180.    TEG made the representations, misrepresentations, and omissions above to induce MAX to continue to maintain a relationship with TEG and not terminate its agreements with TEG despite TEG's repeated malfeasance.

181.    As a result of and in reliance on TEG's misrepresentations, MAX moved forward with TEG as its business partner and continued to maintain a relationship with TEG, all to MAX's detriment.

182.    As a direct and proximate result of TEG's misrepresentations, MAX has been damaged in an amount to be proven at trial.

183.    MAX also seeks punitive damages for TEG's intentional misconduct, and MAX's attorneys' fees and costs, to the extent they are allowable by law or by contract.

<u>**COUNT VI**</u>
**(Claim in the Alternative – Unjust Enrichment)**

184.    MAX hereby reincorporates and re-alleges paragraphs 1 through 148 of the counterclaim as if fully set forth herein.

185.    This count is alleged in the alternative to the breach of contract counts contained herein.

186.    The unjust enrichment claimed herein in the alternative concerns either (1) conduct for which there is no contract between the parties, or (2) the contract between the parties that concerns such conduct is determined to be unenforceable.

187.    MAX rendered a benefit to TEG in the form of licenses to the Haptic federal software.

188.    MAX rendered a benefit to TEG in the form of access to the Haptic source code.

189.    TEG has asserted that the licenses to the Haptic federal software are not enforceable as against TEG.

190.    TEG has asserted that they were entitled to access the Haptic source code without complying with the SCLA.

191.    TEG obtained value from receiving the licenses and source code.

192.    TEG used the licenses and source code to obtain revenue from customers and to secure multiple government contracts.

193.    MAX expected to receive payment for the benefits it provided to TEG.

194.    TEG failed to pay for the benefits it received.

195.    MAX has no remedy at law and has been damaged by TEG's unjust enrichment.

196.    It would be unjust to allow TEG to keep the millions of dollars in revenue generated and value of contracts awarded to TEG due to its access to MAX's software.

## **REQUEST FOR RELIEF**

WHEREFORE, Counterclaim Plaintiff Max Minds LLC requests an order granting the following relief:

1)    Enjoining TEG and its respective agents, employees, officers, directors, servants, attorneys, and representatives from directly or indirectly, or alone or in concert with others, from any further use of MAX's proprietary information including MAX's proprietary Haptic Federal software, any derivative works thereof, and any materials authored by MAX in connection with Haptic Federal;

2)    Directing TEG and its respective agents, employees, and representatives to immediately destroy, and certify the destruction of, all of MAX's proprietary information and any and all copies

thereof, including, among other things, the Haptic Federal software and any derivative works thereof;

3)      Awarding to MAX damages, including punitive damages, in an amount to be determined at trial;

4)      Prejudgment and post-judgment interest, to the extent allowable by law or contract;

5)      Attorneys' fees and costs; and

6)      Such other legal or equitable relief as the Court deems just and proper.

WHEREFORE, MAX requests that TEG take nothing by way of its Complaint, that MAX's Request for Relief for its Counterclaims be granted in all respects, and that MAX be granted all other relief as this Court deems just and proper.

Dated: July 19, 2024                    Respectfully submitted,


*/s/  J. Campbell Miller*
J. CAMPBELL MILLER
Bar Number: 38279-49
campbell.miller@sriplaw.com

**SRIPLAW, P. A.**
231 South Rangeline Road
Suite H
Carmel, Indiana 46032
332.600.5599 – Telephone
561.404.4353 – Facsimile
-and-

JOEL B. ROTHMAN (*Pro Hac Vice*)
joel.rothman@sriplaw.com

**SRIPLAW, P. A.**
21301 Powerline Road
Suite 100
Boca Raton, Indiana 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

-and-

JOSEPH A. DUNNE (*Pro Hac Vice*)
joseph.dunne@sriplaw.com

**SRIPLAW, P. A.**
175 Pearl Street
Third Floor
Brooklyn, Indiana 11201
929.200.8446 – Telephone
561.404.4353 – Facsimile

*Counsel for Defendant Max Minds, LLC*