# TEG EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TRIANGLE EXPERIENCE GROUP, INC., | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | Case No.: 1:24-cv-00650-JPH-MG |
| | ) | |
| MAX MINDS, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendant/Counterclaim Plaintiff.* | ) | |

## FIRST AMENDED COMPLAINT

Triangle Experience Group, Inc. ("TEG"), by counsel, for its First Amended Complaint against Max Minds, LLC ("Max") alleges as follows.

### SUMMARY

1.     TEG and Max entered into a Joint Venture Agreement attached as **Exhibit 1** (the "JVA"). Under the JVA, the parties were to collaborate on creating a new software system, to be known as "Haptic," which could be used by both the federal government (the "Haptic Federal" version) and commercial entities. Under the JVA, the parties would co-own the technology created by the collaboration, and the parties would share 50/50, the revenues generated by their collaboration, with some exceptions.

2.     Max breached the JVA by: (1) creating a defective product for the federal government space that failed catastrophically; (2) failing to provide TEG with sufficient updates of the Haptic Federal software; (3) failing to create a separate commercial branch or version of the software (a "Haptic Commercial" version); (4) using the funding provided by TEG to update the software into a product known as "Alleo," which Max sought to conceal from TEG; and (4)

refusing to share with TEG the revenues generated by Max's sales of Haptic, Haptic Federal and/or Alleo, all of which were essentially the same product with different updates.

3.      Max breached its warranty of implied fitness for a particular purpose because the software failed catastrophically.

## PARTIES

4.      TEG is a Virginia stock corporation with a principal place of business in Ashland, Virginia, 11182 Hopson Road, Suite A, Ashland, Virginia 23005. TEG specializes in providing services to the federal government.

5.      Max is an Indiana limited liability company, with a principal place of business in Carmel, Indiana, 12400 North Meridian Street, Suite 175, Carmel, Indiana 46032. Max was created on May 3, 2018. Upon information and belief, Max's sole member is Brandon Fischer ("Fischer"), who is domiciled in Indiana.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 USC § 1332(a)(1) because this matter involves claims between citizens of different states where the amount in controversy exceeds $75,000.

7.      Venue is proper in this Court pursuant to a Court Order from the United States District Court for the Eastern District of Virginia.

8.      Max is subject to personal jurisdiction in this Court because its principal place of business is located in this judicial district and it regularly transacts business in this judicial district.

## FACTS

**A. TEG and its Customers**

9.     TEG was formed in 2012 as a service-disabled veteran owned small business that provides services and support to the United States government pursuant to government contracts.

10.    Since its inception, TEG has successfully provided cutting edge military technology to the United States government through various contract vehicles and has enjoyed fruitful and lasting relationships with several customers within the Department of Defense.

11.    One of TEG's premier services provided to its government customers is an operating system originally known as "C4MAP" – "Comprehensive Collaborative Command & Control Mission Application Platform."

12.    C4MAP is a collection of commercial off the shelf ("COTS") software components which integrates multiple mission command platforms and collaboration tools into one common operational picture ("COP").

13.    C4MAP provides a globally military-hardened, distributed, synchronized, uniform collaborative, highly secure operation center. In essence, C4MAP provides the fusion and interconnection of information on a single screen, which has limitless benefits to the United States government and its Department of Defense.

14.    C4MAP is also known as a "Virtual Joint Operations Center" or "VJOC" capability in the Department of Defense ("DoD") and intelligence community.

15.    C4MAP, or VJOC, is a server-based collaborative workspace that uses a browser interface to enable users to collaborate in real time. VJOC has screensharing capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the VJOC workspace.

3

16.    The VJOC workspace is an infinite canvas of screen real estate that operates synchronously for all members in real-time.

17.    The benefits of VJOC to the United States Department of Defense are essentially limitless and incredibly valuable.

18.    TEG has enjoyed a long history of providing C4MAP/VJOC and its capabilities to the Department of Defense.

19.    C4MAP, like any operating system, requires a source code for configuration, installation, operation, integration and deployment to deliver capabilities.

20.    Initially, C4MAP was powered by a source code known as "Synthesis," which was owned by a company known as Prysm.

21.    Fischer was formerly a senior software developer at Prysm with the title Vice President.

22.    While a Prysm employee, Fischer attended multiple presentations of C4MAP, during which time TEG and its engineers demonstrated C4MAP and its capabilities.

**B.  TEG and Max Collaborate in a Joint Venture**

23.    In the spring of 2018, TEG and Fischer (who was no longer employed by Prysm) began exploring the opportunity to work together, with Fischer providing the source code to power a C4MAP/VJOC operation system for TEG. In May 2018, Fischer founded Max to provide general software solutions to customers.

24.    On July 2, 2019, after his non-competition period with Prysm had expired, Fischer told TEG that he was coming to Washington, DC and would like to meet with TEG.

25.    At this time, Max did not have a complete, working software product.

4

26.     On July 17, 2019, TEG and Max entered into a mutual non-disclosure agreement which is attached as **Exhibit 2** (the "MNDA"). Under the MNDA, the parties promised to keep each other's information confidential for five years.

27.     After entering into the MNDA agreement, TEG brought Fischer/Max to a federal government lab in Suffolk, Virginia. TEG then showed Fischer the critical information necessary to operate a virtual collaborative workspace. Fischer explained to TEG that he wanted TEG to hire and/or partner with Max to build and improve TEG's C4MAP system with new software to deliver C4MAP's capabilities.

28.     After July 2019, Fischer used the confidential information provided to him by TEG and worked with TEG's employees to create a beta version of a new software, known as "Haptic."

29.     On October 5, 2019, Fischer emailed TEG and invited TEG to virtually test the new software. After October 5, 2019, Fischer and TEG's staff worked to improve Haptic, as detailed by the chat log of activity, albeit doing so without any agreement other than the MNDA.

30.     On November 5, 2019, Fischer met with TEG in Chantilly, Virginia to discuss the new capability moving forward with funding for continued development of the "Haptic" software.

31.     On January 23, 2020, TEG and Max executed the JVA identified previously as **Exhibit 1**.

32.     Pursuant to the JVA, TEG would make a series of payments to Max and, in return, Max would "create and maintain" a branch of the Haptic source code, called "Haptic Federal." So long as TEG hit certain sales goals, TEG would enjoy exclusive rights to provide Haptic Federal to the federal government.

33.     The parties agreed that Max would provide TEG with software updates no less than once every three months.

5

34.     The parties agreed that any intellectual property resulting from custom software development paid for by TEG would be co-owned by TEG and Max.

35.     The JVA further provided that the parties would share 50/50 revenue on total sales of Haptic Federal product and user license sales in the federal space, with certain exceptions, as well as total sales in the non-federal space when using co-owned IP, with certain exceptions.

36.     Throughout the time period beginning in 2019 and continuing thereafter, TEG and Max worked together to create and develop the Haptic software. At all times, Haptic was intended to be and was a joint work of both TEG and Max.

37.     The Haptic software and source code, including all of its versions or branches, are co-owned by TEG and Max.

## C.   TEG Generates Customer Interest But Max's Performance Falters

38.     In May 2020, TEG demonstrated the new C4MAP, powered by Haptic, to the Commanding General of the U.S. Army's XVIII Airborne Corps. The success of this demonstration led to the US Army sponsoring an IATT (Interim Authority To Test) and the first large-scale fielding and testing of the beta version of C4MAP, powered by Haptic.

39.     From August 2020 through October 2020, the U.S. Army tested the new C4MAP powered by Haptic. This testing resulted in the identification of approximately 250 fixes that were needed to solve various problems.

40.     Despite the large number of problems, the Army viewed C4MAP powered by Haptic as a "game changer," and that led to new challenges.

41.     In October 2020, C4MAP, powered by Haptic, was used by XVIII Airborne Corps for testing and fielding of the new capability. The new capability was recommended by XVIII

Airborne Corps by the Joint Special Operations Command, who had previously tested the capability.

42.     In February 2021, TEG invited Fischer to Ft. Hood, Texas so that he could see how the U.S Army intended to use C4MAP powered by Haptic. Fischer stated that he was "humbled and profoundly inspired."

43.     In March 2021, TEG submitted the Haptic software to the U.S. government for evaluation. Because TEG was able to prove the value of C4MAP across the DoD during the initial IATT, the government decided to obtain a full ATO (Authority To Operate) on a classified network.

44.     In August 2021, TEG received an email from John McDonald ("McDonald") of Next Studios. Even though McDonald was not a party to the MDNA, McDonald told TEG that Max had asked him to manage processes.

45.     In October 2021, Fischer informed TEG that he was developing a use case to use with potential investors. Fischer failed to state whether he had provided an NDA to potential investors or had informed them that TEG was Haptic's co-author and co-owner, or otherwise disclose Max's partnership with TEG.

46.     In November 2021, to accredit the software, the U.S. Army purchased the fielded version of C4MAP powered by Haptic, which was known as version 3.1.17. This was the last version that functioned properly.

47.     On December 13, 2021, TEG learned, by logging on to c4map.hap.tc, that Max had covertly changed Haptic's name to Alleo. When questioned, Fischer admitted that Alleo was simply a name change.

48.     In a call on December 15, 2021, although TEG had provided substantial funding to Max to fix the problems identified in testing with the federal government, Fischer indicated that he did not want to do any more custom engineering projects for TEG, unless there was a specific well-defined project. He noted that the "ownership of the IP" had muddied the waters. When asked about the name change of Alleo, Fischer responded that he had given TEG too much access. When Fischer was questioned about the need for a separate branch of Haptic, namely, "Haptic Federal," Fischer responded that that was his intent, "when that time comes." He had not made any such division yet, because it was too expensive.

49.     Whatever Fischer's intention, on April 1, 2022, Max began advertising Alleo to government contractors, instead of Haptic.

50.     For the next year, the parties continued to work together, with TEG reporting critical bugs and software failures to Max, including, but not limited to, the following: on April 5, 2022 (Presentation mode), April–September 2022 (Dumpster Blender), and November 2022 (Configuration Tool). As a result of these critical failures, TEG did not make additional sales.

51.     On December 8, 2022, TEG provided Fischer with a document prepared by the U.S. Central Command that outlined the government's concerns and priorities. Max has never responded to this document.

52.     As a result of a test on January 4-5, 2023, another critical failure was identified in the software's "Live Notepad," which oversaturated the application and customer network with message traffic.

53.     On January 10, 2023, the software failed to work as intended.

54.     On January 15, 2023, the DoD began turning off aspects of the software, like Live Notepad, that were causing problems.

55.     On January 26, 2023, during a dress rehearsal for a full DoD exercise, users were not able to screen share, play video, or take leader control of the platform due to a problem in the Haptic code.

56.     On January 27-31, 2023, TEG discovered that Max had unilaterally, without informing TEG, reduced the bitrate for video share quality since providing the 3.1.17 version. Max then delivered a hot fix but said that it had not been able to test it.

57.     On February 8, 2023, TEG's system maintenance detected new critical bugs and failures.

58.     On February 22, 2023, TEG received the newest version from Max (version 3.1.21.4). TEG immediately identified critical failures that made the software not useable.

59.     On March 30, 2023, the U.S. government scanned version 3.1.21.3 and identified more than 50 critical errors.

60.     On May 5, 2023, TEG notified Max that it still does not have a product that it can effectively sell to the U.S. government.

61.     Despite paying millions of dollars to Max for engineering services and custom software development, losing millions of dollars in attempting to repair Max's failed efforts, and losing millions of dollars in sales, TEG discovered that Max was actually releasing monthly updates to its Alleo product but failing to provide any new features and fixes to the Haptic/Haptic Federal product. In other words, Max was taking money from TEG under the JVA, applying the funds to update and better Alleo, neglecting its obligations under the JVA concerning Haptic, and diverting profits from TEG that would otherwise be due regarding sales of Alleo.

62.     Additionally, TEG learned that Max had sold the Alleo software to one or more federal government customers, even though TEG enjoyed exclusivity in the federal government space under the terms of the JVA.

63.     On information and belief, in March and April 2024, Max filed applications for and obtained copyright registrations for various versions of the Haptic software, including Registration No. TXu 2-412-490, Registration No. TXu 2-419-714, Registration No. TXu 2-419-718, and Registration No. TXu 2-425-362.

64.     Max improperly failed to list TEG as a co-author and co-claimant in each of these registrations.

## COUNT I (Declaratory Judgment of Joint Authorship/Co-Ownership)

65.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

66.     As a result of the acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court of sufficient immediacy and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

67.     The software at issue in this matter is all the same, whether it is called Haptic, Haptic Federal, Haptic Commercial or Alleo.

68.     Since at least as early as July 2019, TEG and Max worked together to create and develop this software.

69.     Throughout the parties' relationship and collaboration on developing this software, TEG and Max objectively manifested their shared intent to work together in the creation of the software.

70.     Throughout the parties' relationship and collaboration on developing this software, TEG had control and decision-making authority over the software and how contributions to the software would be incorporated.

71.     Throughout the parties' relationship and collaboration on developing this software, TEG contributed independently copyrightable material to the software.

72.     The software is a "joint work" within the meaning of the Copyright Act.

73.     As such, TEG is a joint author or co-author of the software and TEG is a co-owner of all copyright interests in the software entitled to one-half of the undivided interests in the software.

74.     A judicial declaration is necessary and appropriate so that TEG may confirm its ownership rights in the software.

75.     TEG is entitled to a judicial declaration that: (1) the software is a joint work under the Copyright Act; (2) TEG is a co-author of the software; (3) TEG is co-owner of the software and all copyright interests in the software, sharing one-half of the undivided interests with Max; and (4) TEG is entitled to a one-half share of all revenue received by Max from all sales or licensing of the software.

### COUNT II (Breach of Contract – JVA)

76.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

77.     Max breached the JVA by failing to create and maintain a functioning source code.

78.     As a direct and proximate result of Max's conduct alleged herein, TEG has been harmed and is entitled to direct and consequential damages in the amount of $90 million or such other amount to be determined at trial.

## COUNT III (Breach of Warranty)

79.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

80.     Max breached the implied warranty of fitness for a particular purpose by failing to create and maintain a functioning source code for the purpose of TEG's federal government customers.

81.     As a direct and proximate result of Max's conduct alleged herein, TEG has been harmed and is entitled to direct and consequential damages in the amount of $90 million or such other amount to be determined at trial.

## COUNT IV (Breach of Contract – JVA)

82.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

83.     Max breached the JVA by making sales of the software and failing to provide TEG with 50 percent of the revenues of Max's sales or licensing of the software.

84.     As a direct and proximate result of Max's conduct alleged herein, TEG has been harmed and is entitled to damages in the amount of $10 million or such other amount to be determined at trial.

85.     TEG is also entitled to an accounting of Max's revenue received from all sales or licensing of the software and a constructive trust with respect to TEG's 50 percent share of such revenue.

## COUNT V (Breach of Contract – MNDA)

86.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

87.     Max breached the MNDA by providing TEG's confidential information to third parties, including vendors, investors, and other parties, without TEG's permission.

88.     As a direct and proximate result of Max's conduct alleged herein, TEG has been harmed and is entitled to damages in the amount of $10 million or such other amount to be determined at trial.

**COUNT VI (Declaratory Judgment - Cancellation of Copyright Registrations)**

89.     TEG repeats and realleges paragraphs 1 through 64 of this First Amended Complaint as if fully set forth herein.

90.     As a result of the acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court of sufficient immediacy and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

91.     The software is a "joint work" within the meaning of the Copyright Act.

92.     As such, TEG is a joint author or co-author of the software and TEG is a co-owner of all copyright interests in the software entitled to one-half of the undivided interests in the software.

93.     Any copyright registrations obtained by Max for the software that do not include TEG as a co-author and co-claimant are, therefore, inaccurate and incomplete.

94.     A judicial declaration is necessary and appropriate so that TEG may confirm its ownership rights in the software and its appropriate inclusion as a named co-author and co-owner/co-claimant in any copyright registrations covering the software.

**DEMAND FOR RELIEF**

WHEREFORE, TEG respectfully requests judgment against Max as follows:

1.      Adjudging and declaring that (1) the software is a is a single joint work within the meaning of the Copyright Act regardless of whether it is called Haptic, Haptic Federal, Haptic Commercial or Alleo; (2) TEG is a co-author of the software; and (3) TEG is co-owner of the software and all copyright interests in the software, sharing one-half of the undivided interests with Max.

2.      Adjudging and declaring that TEG is entitled to a one-half share of all revenue received by Max from all sales or licensing of the software.

3.      Ordering Max to provide an accounting of Max's revenue attributable to sales or licensing of the software.

4.      Ordering Max to cancel any and all copyright registrations in which it is listed as the sole author and/or claimant for rights in the software pursuant to the procedure set forth in Section 1807.4(E) of the Compendium of the U.S. Copyright Practices. U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1807.4(E) (3d ed. 2021).

5.      Awarding TEG all damages sustained by TEG as a result of Max's unlawful conduct alleged herein, in an amount to be proven at trial.

6.      Awarding TEG interest, including pre-judgment and post-judgment interest, on the foregoing sums.

7.      Awarding TEG all fees (including attorneys' fees as appropriate), expenses, and costs associated with this action; and

8.      Awarding TEG such other and further legal or equitable relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this action for all claims so triable.

Dated: September 13, 2024

Respectfully submitted,


_/s/ Richard D. Kelley _____
Richard D. Kelley, *admitted pro hac vice*
Raighne C. Delaney, *admitted pro hac vice*
Stephen D. Caruso, *admitted pro hac vice*
Samuel J. Banks, *admitted pro hac vice*
**BEAN KINNEY & KORMAN, PC**
2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Tel: (703) 525-4000
Fax: (703) 525-2207 (Fax)
rkelley@beankinney.com
rdelaney@beankinney.com
scaruso@beankinney.com
sbanks@beankinney.com

Marc T. Quigley, Atty. No. 21054-53
**KRIEG DeVAULT LLP**
12800 North Meridian Street, Suite 300
Carmel, Indiana 46032
Tel: (317) 566-1110
Fax: (317) 636-1507
mquigley@kdlegal.com

Alexandra Wilson Pantos, Atty. No. 37003-49
**KRIEG DeVAULT LLP**
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
Tel: (317) 636-4341
Fax: (317) 636-1507
awilson@kdlegal.com

*Counsel for Triangle Experience Group, Inc.*

# EXHIBIT 1



Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

# Joint Venture Agreement

### Agreement

Triangle Experience Group ("TEG") and Max Minds, LLC ("MAX") are entering into the following Joint Venture Agreement. The key tenants of the agreement are:

1. TEG will represent the capability, maintain the delivered systems and provide capability attributes statements to the federal customer. TEG will maintain a web presence for marketing material of the Haptic Federal product.  TEG will deliver, deploy, sustain and develop customer requirements.
2. MAX will develop and engineer capabilities to support the customer needs.  TEG and MAX will partner together to deliver capabilities to the end user in the federal customer space.

The agreement has three main sections:

1. Collective approach to sell, deliver and sustain a collaborative capability to the US Government.
2. Share revenues awarded by US Government customers.
3. Maintain a federally focused source code, called Haptic Federal, for exclusive use by the US government.  The exclusivity comes with TEG's ability to sell, market, install, train, maintain the capability.  Considering, MAX concentrates on the development and engineering of its platform.

### Retainer

TEG agrees to execute an initial retainer payable to MAX.  The retainer and associated payment schedule is commensurate and contingent upon government funds. Retainer payments are credited towards revenue targets below.

1. **1 Feb – 30 Apr 2020:** $45k, payable on or before 01 Feb 2020
2. **1 May- 27 July 2020:** $75k, payable on or before 01 May 2020
3. 27 July 2020 – 27 July $25k per month, payable on or before the first of each month.

Description of payments:

- Payment #1 is guaranteed currently available funds
- Payment #2 is proposed & contingent upon govt funding of the remaining ceiling on base year contract
- Payment #3 is proposed & contingent upon govt funding the option year associated with current contract
- All $25k per month retainer fees in this section will end and be replaced once the sales revenue payments meet or exceed $300K per year as per section titled "**TEG and MAX revenue share**" of this Joint Venture agreement.

Retainer payments will be used by MAX for the following:

- Create and maintain a branch of the Haptic source code, called Haptic Federal;
- Install and support the 2x installations that TEG has requested for testing and demonstration purposes;
- As the commercial Haptic platform evolves, MAX will provide TEG with a software update at least once every 3 months;



UNCLASSIFIED

Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

- MAX will support TEG, when possible, at any demos/events;
- MAX will collaborate with TEG on marketing/sales collateral.

**Exclusivity of Distribution**
TEG is the exclusive distributor/reseller of the Haptic Federal product into the federal market. Below are the license-based revenue targets, paid to MAX, that need to be hit in order to (maintain) the exclusivity beyond the first year.
- $300K in 2020
- $1M in 2021
- $3.75 in 2022
- $5M in 2023
- $10M in 2024
- after year 5, a 50% growth rate year-over-year

**Information Exchange**
TEG and Max agrees to establish and share an electronic files system.  TEG and MAX agree to work collaboratively on the preparation and delivery of:
- Proposals
- Marketing materials
- Activity reporting to government customers
TEG and MAX agree to conduct routine project and program management review discussions.

**Intellectual Property**
Any Intellectual Property ("IP") resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX, except any plug-in features paid for by the government that are contractual deliverables to the govt customer.

**Demo Product/Licenses**
MAX agrees to partition two instances of Haptic Federal, for testing and demo purposes, and provide TEG with the ability to create unlimited user accounts.  One instance will be used for testing and development and one will be used for demonstrations.  Both instances will be installed in the TEG commercial data center.  The data center will be hosted by TEG and access will be given to MAX personnel.

**Source Code**
If either TEG or MAX should cease to be a viable company the other company would convert ownership of the source code in an ownership transfer, so long as TEG is still the exclusive reseller/distributor.

**Haptic Federal Pricing**
- Target MSRP $500k (minimum $250K, per location) On-Prem C4MAP Secure Gateway Nod (SGN): TEG is responsible for shipping, delivery, functional acceptance, install, training and Tier 1 support.
- Target MSRP year over year renewal: 20% of negotiated sale price above (minimum $50K per year, per location)

- MAX and/or MAX development partners may develop new products or add-ons that TEG can resell into the federal market.  Pricing and margin to be determined.

### TEG and MAX revenue share:
- 50% on total sale of Haptic Federal product and user license sales in federal customer and opportunity business space
    - Exceptions: Training, A/V installs, additional H/W expenses, accessories
- 50% on total sale in non-federal opportunities, when using co-owned IP
    - Exceptions: Any non-federal sale opportunity exclusive to TEG or MAX

### Channel Sales and Display Partner Relationships
- TEG will establish and manage all federal channel sales partnerships.  Any channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue.
- TEG recognizes that MAX maintains close relationships with display manufacturers, like Planar, Dell, etc.  These display manufacturers will occasionally send sales leads and/or invite MAX to participate with them in events/tradeshows.  Any Federal sales opportunities that come to MAX from these events will be handed off to TEG.  For these opportunities, TEG agrees to resell displays from the display manufacturer and not specify a competitive product.

### Acquisition of Source Code
If TEG finds a suitor for the Haptic Federal product, MAX would be willing to sell the Haptic Federal source code.  Sale price could be calculated as the greater of $5M -or- 5x gross sales from the previous year.  If TEG and MAX both agree on all terms of the sale, the proceeds could be split in the following way:
- 50% split, if sale price is $20M or more.
- 70% MAX, 30% TEG if sale price is less than $20M.

### Drag-Along Rights
If either MAX or TEG is sold; the terms of this agreement will still be honored by the acquiring company for 36 months.


SIGNATURE PAGE FOLLOWS

TEG

UNCLASSIFIED

Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

The Joint Venture Agreement is accepted on this 13th day of January 2020.

Triangle Experience Group ("TEG")          Max Minds, LLC ("MAX")

Robert Clare   Digitally signed by Robert
               Clare
               Date: 2020.01.23 12:39:40
               -05'00'

By: _____          By: _____

Printed:   Robert Clare          Printed:   Brandon Fischer

Title:     CEO/President          Title:     CEO/Founder

Date:      23 January 2020        Date:      23 January 2020

# EXHIBIT 2



## MUTUAL NONDISCLOSURE AGREEMENT
### TEG/MAX Minds LLC

THIS AGREEMENT is made and entered into as of JULY 17, 2019 by and between Triangle Experience Group, Inc (TEG) a corporation organized and existing under the laws of the Commonwealth of Virginia with an office located at 1 Bowman Drive, Suite 175, Fredericksburg, VA 22408 and Max Minds, LLC (MAX) a corporation organized and existing under the laws of the State of Indiana having offices at 4142 Pete Dye Blvd, Carmel, IN 46033. "Party" means each party individually; "Parties", "Disclosing Party", or "Receiving Party" means TEG and MAX, or each Party individually as they receive or disclose information.

NOW THEREFORE, in consideration of the foregoing and of the mutual promises contained herein, the Parties hereto do hereby mutually agree as follows:

1. **Definitions.** Confidential Information means all confidential or proprietary information in oral, written, graphic, electronic or other form including, but not limited to, past, present and future business, financial and commercial information, business concepts, prices and pricing methods, marketing and customer information, financial forecasts and projections, technical data and information, formulae, analyses, trade secrets, ideas, methods, processes, know-how, computer programs, products, equipment, product road maps, prototypes, samples, designs, data sheets, schematics, configurations, specifications, techniques, drawings, and any other data or information delivered by either of the Parties to the other.

2. **Identification of Confidential Information.** All information which is disclosed by the Disclosing Party to the Receiving Party and which is to be protected hereunder as Confidential Information:

    (a) shall be limited to Confidential Information disclosed to the Receiving Party during the term of this Agreement;

    (b) if in writing or other tangible form, shall be identified at the time of delivery by means of a clearly marked permanent stamp or conspicuous label bearing a term such as "Confidential", "Proprietary", "Competition Sensitive", or equivalent;

    (c) if disclosed in electronic form on digital media or other storage media, shall be marked with an appropriate legend display when the information originally runs on a computer system and when the information is printed from its data file; and

    (d) if disclosed in other than permanent form (for example verbally or visually) shall be: (i) identified as proprietary or confidential prior to disclosure; or (ii) identified as confidential within ten (10) days of the initial disclosure in a written notice summarizing the nature of the disclosure.

    In addition, all information disclosed as a result of Receiving Party's access to Disclosing Party's system(s) shall be protected hereunder as confidential information, regardless of whether that information contains any markings identifying it as such.

3. **Term of Confidentiality.** The Receiving Party will hold Confidential Information in confidence for a period of five (5) years following its receipt in accordance with this Agreement.

4. **Standard of Care for Protection**

    (a) The obligation to protect Confidential Information will be satisfied if the Receiving Party utilizes the same controls it employs to avoid disclosure, publication or dissemination of its own Confidential Information of a similar nature, but in any case, not less than reasonable care.



(b)  The Receiving Party will make Confidential Information available only to those of its employees, consultants and contractors having a need to know and solely for the Purpose of this Agreement, provided that the Receiving Party has taken adequate steps to bind an employee and other recipients with respect to the use and protection of the Confidential Information under terms and conditions substantially similar to those herein.

5.  **Points of Contact**.  The designated points of contact with respect to the transmission and control of Confidential Information exchanged hereunder are designated by the respective Parties as follows:

> For MAX:      Brandon Fischer
> Address:       4142 Pete Dye Blvd
>                      Carmel, IN 46033
> e – mail:       brandon@maxminds.com
> Telephone:   317-514-5000
>
> For: TEG: Janna Clare
> Address: 1 Bowman Dr., Suite 175
>                 Fredericksburg, VA
>                 22408
> email: jclare@triangleexperience.com
> Telephone: 910-489-9521

Each Party may change its designation by written notice to the other.

6.  **Exclusions**.   This Agreement shall not restrict disclosure or use of Confidential  Information that is:
(a)  developed by the Receiving Party independently of the Disclosing Party's Confidential Information as demonstrated by tangible evidence;
(b)  rightly in possession of the Receiving Party prior to its disclosure to the Receiving Party under this Agreement;
(c)  obtained without restriction by the Receiving Party from a third party who rightfully provided it;
(d)  publicly available other than through the fault or negligence of the Receiving Party; or
(e)  approved for release by written authorization of the Disclosing Party.

7.  **Mandatory Disclosure.**   In the event the Receiving Party is requested or required by legal process to disclose any of the Confidential Information of the Disclosing Party, the Receiving Party shall give prompt notice so that the Disclosing Party may seek a protective order or other appropriate relief.   In the event that such protective order is not sought or obtained, the Receiving Party shall disclose only that portion of the Confidential Information that its counsel advises that it is legally required to disclose.

8.  **Materials.**  All materials provided by "Parties" under this Agreement remain the property of that Party and shall be returned upon request, together with all copies with a certification signed by Company that all copies thereof have either been or are being returned, or have been destroyed to the best of Company's knowledge

9.  **Property Rights.**  All Confidential Information furnished hereunder shall remain the property of the Disclosing Party and shall be returned or destroyed promptly at Disclosing Party's request together with all copies made thereof by the Receiving Party hereunder.   Confidential Information shall not be disclosed to any third parties except as specified in this Agreement.   Confidential Information may be used and copied only as necessary for the Purpose.   Upon request, the Receiving Party shall send the Disclosing Party a certificate certifying the destruction of Confidential Information.

10. **No License of Other Rights**.  Neither the execution of this Agreement nor the furnishing of any information hereunder shall be construed as granting, either expressly or by implication, estoppel or otherwise, any license or other rights under any invention, copyright, patent, trademark or other intellectual property, now or hereafter, owned or controlled by the Disclosing Party.  Each Party warrants that it has the right to provide Confidential Information for the Purpose.



10. **Remedies**.  The Parties acknowledge that their respective Confidential Information is valuable and unique and that disclosure in breach of this Agreement will result in irreparable injury to the Disclosing Party.  Therefore, in the event of a breach or threatened breach of the terms of this Agreement, the Disclosing Party shall be entitled to an injunction prohibiting any such breach in addition to and not in lieu of any other rights and remedies including monetary damages.

11. **Export Requirements**.  The Parties agree to comply with all applicable export laws, rules and regulations of the United States Government, including without limitation, the International Traffic in Arms Regulations of the U.S. Department of State and the Export Control Act of the U.S. Department of Commerce, in connection with the disclosure, use, and export of any Confidential Information disclosed hereunder.  Each Party agrees to provide such information as the other Party shall reasonably consider necessary to verify compliance with this provision. If the Receiving Party of export-restricted information improperly discloses such information, the Receiving Party shall indemnify and hold harmless the Disclosing Party from all resulting claims.  The foregoing indemnity is conditioned upon: (1) the Disclosing Party providing the Receiving Party with prompt notice of any applicable claim; and (2) the Receiving Party being given sole control over the defense and settlement of the claim

12. **Publicity**.  A Party shall not in any way or in any form disclose, publicize, or advertise in any manner the discussions, transactions or subject matter arising out of or relating to this Agreement without the prior written consent of all other Parties.

13. **Governing Law**.  This Agreement shall be governed by the laws of the Commonwealth of Virginia, USA, without regard to its conflicts of laws rules.  The International Sale of Goods Convention shall not apply to this Agreement.

14. **Term of Agreement**.  The term of this Agreement shall be two (2) years from the date first written above, unless earlier terminated by either Party upon providing thirty (30) days prior written notice.  However, the expiration of this Agreement shall not relieve the Parties of their obligations hereunder regarding the protection and use of Confidential Information during the period set forth in Paragraph 3 hereof.

15. **Scope**.  This Agreement, along with the exchange of Confidential Information pursuant to this Agreement, shall not give rise to any commitment or obligation for the Parties to enter into any business relationship.  Any commitments, obligations, or intentions beyond the protection of Confidential Information shall be addressed in a definitive agreement. No warranties or representations are given for the Confidential Information.  The Receiving Party relies on Confidential Information at its own risk.  Until a definitive agreement is signed following a more developed relationship, Confidential Information is provided for discussion purposes and only for the Purpose of this Agreement.

16. **General**.  This is the entire Agreement between the Parties concerning the exchange of Confidential Information and it supersedes any prior or contemporaneous written or oral agreements thereon and may not be amended or modified except by subsequent agreement in writing by duly authorized officers or representatives of the Parties. Nothing herein is intended to or shall create any agency, joint venture or partnership between the Parties.  No failure or delay, in whole or in part, by a Party in exercising any right, power or remedy operates as a waiver thereof.  This Agreement is personal to the Parties and non-assignable without the prior written consent of all other Parties.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to a Party.



IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their authorized representatives:

**Max Minds, LLC**
Agreed:
Max Minds, LLC

By:
Name:    Brandon Fischer
Title      CEO
Date:     July 17, 2019

**Triangle Experience Group, Inc**
Agreed:
Triangle Experience Group, Inc

By:
Name:    Janna Clare
Title      CFO
Date:     July 17, 2019

\* Each of the Parties intends that the printing of its signature printed by a receiving printer or fax machine to constitute an original signature, or to have the equivalent evidentiary value of the original signature.

Page 4 of 4