# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TRIANGLE EXPERIENCE GROUP, INC.,<br>　　　　Plaintiff,<br><br>v.<br><br><br>MAX MINDS, LLC,<br><br>　　　　Defendant. | CAUSE NO. 1:24-cv-00650-JPH-MG<br><br>JURY TRIAL DEMAND |

**AGREEMENT AND ORDER GOVERNING PROTOCOL FOR DISCOVERY OF
ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS**

To expedite the exchange of ESI and Hard Copy Documents (as defined below), the following Order Governing Protocol for Discovery of Electronically Stored Information and Hard Copy Documents ("ESI Protocol") shall apply in this action.

## I.   DEFINITIONS

1.　"Documents" shall have the same definition as set forth in Federal Rule of Civil Procedure 34.  The term "Documents" includes ESI.

2.　"Electronically stored information" or "ESI" means and refers to computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.  These terms include the types of electronically stored information addressed by Federal Rule of Civil Procedure 34.

3.　"Hard Copy Documents" means any Documents that are not ESI.

4.　"Native Format" means and refers to the format of ESI in which it was generated and/or as used by the Producing Party in the usual course of its business and in its regularly conducted activities. Where ESI is not stored in a portable native format, a usable exported format will suffice.

5.　"Load/Unitization file" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends. A Load/Unitization file will also contain data relevant to the individual Documents, including extracted and user-created metadata.

6. "Extracted Text" means the text electronically extracted from a Document, and includes all header, footer and document body information when reasonably available.

7. "OCR text" means text generated through an Optical Character Recognition Process.

8. "Media" means an object or device (including a disc, tape, computer or other device) whether or not in the Producing Party's physical possession, on which data is or was stored.

9. "Parties" means or refers collectively to the named Plaintiff and Defendants in the above-captioned matter, as well as any later added plaintiffs and defendants. "Party" shall refer to a plaintiff or defendant, individually.

10. "Producing Party" means or refers to a Party in the above-captioned matter from which production of ESI or Hard Copy Documents are sought.

11. "Requesting Party" means or refers to a Party in the above-captioned matter seeking production of ESI or Hard Copy Documents.

12. "Protective Order" means or refers to the Stipulated Protective Order entered by the Court in this matter.

## II. COST CONTAINMENT

1. Files Deleted Prior to Preservation Duty. For the avoidance of doubt, the Parties shall not be obligated under this Order to produce or preserve ESI that was deleted or lost prior to the date upon which the duty to preserve ESI arose.

2. Types of ESI That Need Not Be Preserved or Searched. The Parties agree that there is no need to preserve or collect ESI from the following sources which are deemed not likely to contain relevant information and to be not reasonably accessible:

a) voice mails that are not automatically transcribed and delivered to a custodian's e-mail address;

b) random access memory (RAM), temporary files, or other ephemeral data;

c) on-line access data such as temporary internet files, histories, caches, cookies, etc.;

d) deleted, slack, fragmented, or other data accessible only by forensics;

e) data in metadata fields that are frequently updated automatically, such as last-opened dates, except as specified in this Order (the metadata fields identified in **Exhibit 1**);

f) dynamic fields of databases or log files that are not retained in the usual course of business;

   g)  information from handsets, mobile devices, personal digital assistants, and tablets that is duplicative of information that resides in a reasonably accessible data source, and;

   h)  personal computers and personal e-mail not used for any business activities.

  3.  <u>Embedded Materials</u>.  The parties shall preserve but shall have no obligation to review or produce ESI embedded within other ESI (e.g., a spreadsheet embedded in a PowerPoint presentation).  If a Receiving Party believes there is good cause for a Producing Party to produce particular embedded materials, the parties shall confer in good faith on the issue.

  4.  <u>Automatically Saved Versions of Documents</u>.  The Parties agree that with respect to documents that automatically save, only the most recent version of such documents existing at the time of collection need to be searched and, if relevant, produced, in light of the burden of searching and producing prior versions of each document.  The Parties agree to meet and confer regarding reasonable requests made in good faith for the production of prior versions of a specific document.  For the avoidance of doubt, this provision does not exempt from production any manually saved versions of such documents.

## III. <u>PRODUCTION</u>

###  A. Hard Copy Document Production Format... 

  A. **De-duplication of Production**

  1.  <u>General</u>.  The Parties shall use reasonable, good faith efforts to avoid the production of duplicate ESI following industry-standard practices for MD5 or SHA-1 hash comparison.

  2.  <u>Exact Duplicates</u>.  To the extent that exact duplicate documents (based on MD5 or SHA-1 hash values) reside within a Party's ESI data set, each Party shall produce only a single copy of a responsive document or record.  Where any such documents have attachments, hash values must be identical for both the document-plus-attachment as well as for any attachment standing alone.  Loose electronic documents will not be compared to email or email attachments for deduplication.

  3.  <u>No Manual Review</u>.  No Party shall identify and/or eliminate electronic duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.  The Producing Party can either de-duplicate documents within custodians/sources, or across custodians/sources.  To the extent a Party de-duplicates documents, the Party shall populate a field of data that identifies each custodian who had a copy of the produced document (the "Custodians" field).

  B. **Hard Copy Document Production Format**

  1.  <u>Production</u>.  All Hard Copy Documents shall be produced as static images:  The images will be in black-and-white, single page, 300 DPI, Group IV* .TIFF images, .TXT format and standard load files or PDF files, which can be used with commercially available litigation software packages, and the Default Production Fields as described in Exhibit 1.  Hard copy color paper documents will be produced in grayscale in TIFF or PDF format.  The Parties will accommodate reasonable requests for production of specific images in color to the extent available.

Producing such Hard Copy Documents in such form does not change their character from Hard Copy Documents into ESI.

      2.    <u>Unitization</u>.  If a Hard Copy Document is more than one page, to the extent possible, the unitization of the document and any attachments or affixed notes should be maintained as it existed when collected by the Producing Party.  Parties may unitize their documents using either physical unitization (*i.e.*, based on physical binding or organizational elements present with the original paper documents like staples, clips and binder inserts) or logical unitization (*i.e.*, a manual review of the paper to determine what logically constitutes a document like page numbers or headers).  If unitization cannot be reasonably maintained, the original unitization should be documented in the data load file or otherwise electronically tracked if reasonably possible.

      **C.**    **ESI Production Format**

      1.    <u>General</u>.  The following provisions shall generally govern the production format and procedure for ESI.

      2.    <u>Production of ESI (both Native and Non-Native)</u>.  All responsive ESI except that which is produced in Native Format pursuant to Section C.3 should be produced in black-and-white, single page, 300 DPI, Group IV* .TIFF images or PDF files with corresponding extracted full text or text generated via OCR pursuant to paragraph C.2.c. below, and affiliated metadata as identified in Exhibit 1.  All productions will include these additional specifications:

      a)    a load file for images (.opt file);

      b)    delimited load file (.dat file) containing the metadata fields Identified in Exhibit 1 (for ESI) and a field with the full path and filename to native files produced on the delivery media pursuant to Section C.3

      c)    document-level .txt files for all documents containing extracted full text or OCR text if extracted text is not available or if the document has been redacted;

      d)    Bates number branding and Confidentiality designation (if any) on the face of the image;

      e)    all hidden text (*e.g.*, track changes, hidden columns, comments, notes, markups, etc.) will be expanded, extracted, and rendered in the TIFF or PDF file; this specifically includes, but is not limited to, the inclusion of any notes or comments contained within any PowerPoint slides/presentations that are produced in TIFF or PDF format; and

      f)    Each of the Metadata and coding fields set forth in Exhibit 1 which can be extracted from a Document shall be produced for that Document.  The Parties are not obligated to manually populate any of the fields in Exhibit 1 if such fields cannot be reasonably extracted from a Document, with the exception of Default Production Fields that are generated in the course of collection, review and production.

      3.    <u>Production of Native Format ESI</u>.

        a)     Responsive spreadsheets (*e.g.*, Excel, Lotus, Google Sheets, Csv, etc.), source code and software files, and media files (e.g. Wav, Mp4, etc.) shall be produced in Native Format, except where such files are redacted. For Google documents, production of an export in a comparable format such as an Excel will constitute a native production. A TIFF or PDF placeholder embossed with the corresponding confidentiality designation and Bates number shall be produced for all ESI produced in Native Format. Native files that require redaction may be produced as TIFF images or PDF files with OCR Text Files in lieu of a native file provided that the TIFF or PDF renderings are manually formatted for optimal review. Nothing in this protocol shall limit a Party's ability to elect to produce other forms of responsive ESI in Native Format. All ESI produced in Native Format shall be produced in the manner set forth in Exhibit 1.

        b)     Extracted Text from native files shall be provided at a document level; one text file per document, using the same name as the beginning Bates number (Document ID) of the document. The text file associated with any redacted document will exclude redacted text (*i.e.*, the Producing Party will OCR the redacted image and replace the original extracted text).

        c)     No Party may attach to any pleading or any correspondence addressed to the Court, Special Master, or any adverse or third Party, or submit as an exhibit at a deposition or any other judicial proceeding, a copy of any native format document produced by any Party without ensuring that either the corresponding slip sheet is attached to the document or the corresponding Bates number and confidentiality legend, as designated by the Producing Party, appears on the document.

    4.     <u>Request for Documents in Native Format</u>. If a Party reasonably concludes that production in Native Format of any document(s) initially produced in TIFF or PDF format is necessary (*e.g.*, to decipher the complete meaning, context, or content, to determine if there is any important use of color in the document, etc.), such Party may request production of the original document in Native Format. The Parties agree to meet and confer in good faith with respect to any such request. Reasonable requests for specific documents in Native Format accompanied by a reasonable explanation for the request shall not be refused. All ESI produced in Native Format produced after such a request shall be produced in the manner set forth in Exhibit 1.

    5.     <u>Appearance and Content</u>. No document may be intentionally manipulated to change how the source document would have appeared if printed out to a printer attached to a computer viewing the file, without prior agreement of the Requesting Party, except as necessary to comply with this Order. Therefore, subject to any appropriate redaction, each document's electronic image shall convey the same information and image as the original document. The Parties shall meet and confer in an attempt to resolve any complaints about the legibility of individual documents.

    6.     <u>Color</u>. The Parties will accommodate reasonable requests made in good faith for the production of specific color images originally produced in greyscale TIFF or PDF format to the extent available and where reasonably necessary to decipher the complete meaning, context, or content of the documents on a case by case basis.

      7.      <u>Load File</u>.  The Producing Party shall provide a Load File to accompany the native files and TIFF or PDF images that are produced, to facilitate the use of the produced images by a document management or litigation support system as described above.

      a)      Load files shall contain the parent/child (*e.g.*, Email/Attachment, Memo/Attachment, Letter/Enclosure) relationships of documents, when possible.

      b)      For all produced documents, a standard Opticon image load file indicating document boundaries and location of images will accompany the images.

      c)      When producing a multi-page document, images for the document should not span multiple directories.

      8.      <u>Document Numbering for TIFF Images and PDF Files</u>.  Each page of a document produced as a TIFF image or PDF file shall have a legible, unique Document Number electronically "burned" onto the image at a location that does not obliterate, conceal or interfere with any information from the source document (*i.e.*, the "Bates Label").  Each file produced in Native Format shall be associated with a unique Document Number included on the TIFF or PDF placeholder provided with the native file.  The Document Number for each document shall be created so as to identify the Producing Party and the Document Number.  Each Party shall have a unique identifying document identifier prefix.  Each page of each production shall have a unique number of eight digits.  The unused digits of the unique number shall be filled with placeholder zeros (0) to facilitate electronic sorting of the documents.

      9.      <u>Organization of Production</u>.  A Producing Party shall organize its production of documents originally existing in hard copy as they are kept in the ordinary course of business, taking care to scan and produce folders, redwelds, binder-covers and maintain other organizational structure.  Such materials should be produced as independent documents and be produced before the documents that were contained in these elements to the extent reasonably accomplishable by the above-addressed unitization, (*e.g.*, the file folder should have a Bates Label immediately before the documents contained in the file folder).  The Producing Party will provide the name of the custodian who had possession of the document when it was collected.  A custodian can include an employee or person's name, a department, or an archive storage if the document was stored in archive when the Party's duty to preserve was triggered; provided, however, to the extent that archived files include custodial information, it shall be provided.

      10.      <u>Family Relationships of Electronic Files</u>.  Parent-child relationships between ESI (*e.g.*, the association between an attachment and its parent e-mail, or a spreadsheet embedded within a word processing document), must be preserved by assigning sequential Bates numbers to all files within a parent-child group, and by providing accurate attachment ranges for those files in the metadata fields required. If all family members are not included in the production, the Producing Party will identify any missing family members via a placeholder image bearing text sufficient to explain why the Document was not produced.

      11.      <u>Email Thread Suppression</u>.  In the course of its review and production, a Party may suppress and not review or produce lower included emails provided that they produce all top level emails of any email branch, any lower included emails that have attachments, if responsive, and

any responsive email that includes unique content not included elsewhere in a produced email string. A party may reasonably request production of an individual lower included email or emails from a produced email string, and any such reasonable requests shall not be refused where the document is available within the Producing Party's document collection.

   12. <u>Production Media</u>. Documents shall be produced via secure FTP site or an external hard drive or flash drive for productions that are too large for expedient FTP transfer pursuant to paragraph 13, or such other readily accessible computer or electronic media as the Parties may hereafter agree upon (the "Production Media"). Each piece of Production Media shall include a unique identifying label and cover letter including the following information:

     a) Name of the Litigation and its case number;

     b) Name of the producing Party;

     c) Date of the production (mm/dd/yyyy);

     d) Volume number;

     e) Bates Number range;

     f) Confidentiality Designation; and

     g) Notes regarding any irregularities in the production (*e.g.*, whether it is replacement Production Media (see below)).

   13. <u>Production Media (FTP Sites)</u>. Producing Parties shall produce initially via an FTP site for production volumes equal to or less than 15 GB on the date of the production. Production volumes of a larger size than 15 GB may be produced by FTP in the process described above or via an external hard drive or flash drive pursuant to paragraph 11. Any replacement Production Media shall cross-reference the original Production Media, clearly identify that it is a replacement, and cross-reference the Bates Number range that is being replaced. Producing Parties may encrypt their Production Media and, if so, shall provide a key to decrypt the Production Media in a separate communication.

   14. <u>Time</u>. When processing non-email ESI for review and for production in TIFF or PDF format, the Producing Party will instruct its vendor to turn off any automatic date stamping. Parties must consistently produce all ESI processed using the same time zone. When a metadata field includes a date and/or time, it shall be provided in the following format: mm/dd/yyyy HH:mm:ss.

   15. <u>Redactions</u>. To the extent that a responsive document contains (a) privileged content, (b) personally identifiable information, (c) other personal or financially sensitive information that is protected by US or foreign data protection laws, (d) or non-responsive HIGHLY CONFIDENTIAL (AEO) Discovery Material (as that term is used in the Protective Order), the Producing Party may produce that document in a redacted form. Any redactions shall be clearly indicated on the face of the document and each page of the document from which information is redacted shall bear a designation that it has been redacted. The designation shall make clear the

reason for the redaction (*e.g.*, "Redacted Privileged" or "Redacted DP Information" or "Redacted Commercially Sensitive Business Information"). Where a document contains both privileged and non-privileged responsive content, the Producing Party shall, to the extent possible, redact the privileged material and produce the remainder of the document as redacted. Non-responsive, Commercially Sensitive Business Information may be redacted from a document only if the document can be redacted without obscuring otherwise responsive information. The Parties agree to meet and confer in good faith to attempt to resolve any dispute arising under this paragraph. If redactions within a native spreadsheet become necessary, the parties will meet and confer to discuss a proposed process and provide a means to identify such documents within a production.

16. <u>Non-Responsive Attachments</u>. The Parties agree that fully non-responsive attachments to responsive parent documents need not be produced. For such fully non-responsive attachments, a placeholder slip-sheet endorsed "Withheld Non-Responsive" will be produced to capture the family relationship.

17. <u>Text Messages, Chats, Short Messaging</u>. Text messages and chats should be provided in electronic format in 24-hour increments, including all metadata and textual content of conversations in the form of (a) spreadsheets with linked attachments, (b) black-and-white, single page, 300 DPI, Group IV* .TIFF images or PDF files with corresponding extracted full text or text generated via OCR pursuant to paragraph C.2.c, or (c) a forensic format captured through a mobile device preservation tool such as a Cellebrite UFDR image. Metadata should include, at a minimum, sender/recipient information, chat participants, dates and times, body text, and associated attachments.

**D. Search Protocol**

1. <u>Identification of Individual and Departmental Custodians</u>. In order to reduce the burden of searching the electronic files and data sources only tangentially related to the subject matter of the claims and defenses in this litigation without overlooking production of relevant and responsive documents, the Parties agree that the identification of individual and departmental custodians and data sources using reasonable, good faith judgment, is an appropriate step to reasonably identify potentially responsive documents. If desired by either party, the parties shall confer in good faith on the identification of custodians to use for the collection of Documents. If one party desires to identify potential custodians, each Party shall disclose in writing the custodians each party believes are most likely to have discoverable ESI in their possession, custody, or control (hereinafter, "Priority Document Custodians"). The Priority Document Custodians shall be identified by name, title, and connection to the instant litigation. <u>As discovery is only beginning, the parties do not agree that Priority Document Custodians is a complete number and believe a larger number is very likely necessary in this matter, and therefore the parties expressly reserve the right to request inclusion of additional custodians as discovery progresses. The use of the Priority Document Custodians is intended to streamline discovery and produce information from Document Custodians most likely to have relevant information initially, with additional Document Custodians added as documents are produced to each party that permit an examination of additional individuals likely to possess relevant information. In addition, each party may request a list of the following potential ESI information:</u>

      a)      Non-custodial Data Sources: A list of known non-custodial data sources (e.g. shared drives, servers, etc.), if any, likely to contain discoverable ESI. As part of their non-custodial data sources disclosures, the parties will identify the databases that contain "structured data" commonly required in these types of intellectual property ownership and joint venture dispute cases, including explanations of the type of data contained in such structured databases;

      b)      Third-Party Data Sources: A list of known third-party data sources, if any, likely to contain discoverable ESI and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

2.    <u>Protocol For Agreeing on Use of Search Filters</u>.  The Parties agree that the application of search terms is an appropriate—but not mandatory step—to reasonably identify potentially relevant ESI or to cull ESI.

3.    <u>Search Term Testing and Validation</u>.  While there are potentially numerous ways to reasonably test and validate search terms, a producing party must take reasonable steps to test and validate the efficacy of search terms—including undertaking steps to test and validate the recall (how many documents determined to be responsive that were actually identified using search terms) and precision (how precise the search terms are, measuring how many non-relevant documents were also search term hits, or how many non•relevant documents one would have to review to find the relevant documents in the document universe) of the terms.  This may be accomplished by generating a number of statistically representative samples based on a high level of confidence and a reasonable confidence interval.  The Parties agree that the standard for confidence should be 95% within a 23.5% margin of error.

4.    <u>Search and Production</u>.  The fact that a document may have been retrieved or identified by application of search terms shall not prevent any Party from withholding from production such document for privilege, objection to the document request seeking the document, or, lack of responsiveness.  Notwithstanding the foregoing, to the extent any Party identifies responsive ESI or documents not identified by the use of search terms or filters, all such non-privileged documents must be produced.

5.    <u>Exchange of Search Information</u>.  Parties are not required to exchange search terms. The Producing Party has an independent duty to refine and calibrate search terms that will find documents responsive to document requests, and to validate that its search terms are reasonably identifying responsive material, such as by evaluating the recall of the search terms (where recall is the percentage of all responsive documents in the dataset which are returned in search results).  This should include a method of validating documents that would not hit on (i.e., elude) terms, including documents that have no readable text, to verify whether responsive information has been missed that should be reasonably captured by search terms and have not otherwise been identified using non-search term methods (for example, folder name or file name searches).

      a)      The Receiving Party may make prompt, reasonable requests that the Producing Party test select search terms. Within fourteen days of receiving proposed search terms from the Requesting Party, the Producing Party shall perform test searches for the proposed search terms, and inform the Requesting Party whether it objects to any of the

proposed terms. The Receiving Party must disclose the results of the test searches if it continues to object to the use of the proposed search terms of the Requesting Party.

  b)  If the Parties are unable to resolve their disputes over search terms through the meet and confer process, the Parties will submit the dispute to the Court. The Producing Party will be required to disclose statistical sampling results and/or the number of documents containing the disputed term or combination of terms in the event Court intervention is sought by the other Party.

  **E.**  **Use of Technology Assisted Review**

  1. <u>Technology Assisted Review</u>. No Party can compel another Party to use technology assisted review or to produce documents without human review over their objection. In addition to the use of search terms, the Parties may use technology assisted review to prioritize the order of review of the documents identified by search terms and/or identify potentially responsive/non-responsive documents so long as industry standard sampling and statistical relevance procedures are observed.

  a)  <u>The Use of TAR to Prioritize.</u> The Parties may use technology assisted review (TAR) to prioritize the order of review of the documents identified by search terms. Technology Assisted Review involves the process of computer software electronically classifying documents based on input from human reviewers, and using algorithms to reduce the amount of review required on documents classified as potentially non-relevant. This process will prioritize the review and production of the most relevant documents.

  b)  <u>The Use of TAR to Cull</u>. Should parties choose to cull documents by using TAR, it shall notify the other party and first reach agreement through a separate, TAR protocol. The protocol shall disclose the TAR software used, the TAR methodology used, the methodology of the training process, the targeted level of recall (e.g., 80%) (if any) and any other standards for stopping review, including (i) the methodology and results of the validation testing used (including elusion testing performed), which shall be accomplished by generating a number of statistically representative samples from both the responsive and non-responsive set, based on a high level of confidence and a reasonable confidence interval, and (ii) how documents containing little or no text (e.g., media files, images, un-OCR'ed PDFs, encrypted files), including a reasonable validation methodology for documents that are not suitable for TAR were handled.

  **F.**  **Structured Data Format**

  1.  To the extent a response to discovery requires production of discoverable electronic information contained in a database and it cannot reasonably be produced in either Excel or .csv format, in advance of producing such information, the Parties agree to meet and confer-regarding the format of the production (*e.g.*, commercial database, or some other agreed-upon format). If the structured data exists in a proprietary database format, and an exportable electronic file cannot be created in a reasonably usable format, then the Parties will meet and confer regarding utilizing the proprietary software to generate the production in an alternative format or other options.

  **G.**  **Confidentiality of Produced ESI**

      1.    <u>Native and Non-Native Format</u>.  Responsive ESI, whether produced as TIFF images, PDF files, or in Native Format, shall be produced pursuant to the terms of the Protective Order.

      2.    <u>TIFF and PDF Format</u>.  If the Producing Party is producing ESI in TIFF or PDF Format subject to a claim that ESI is protected under the Protective Order, the word "CONFIDENTIAL", "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be burned electronically on each page of such document.  The Producing Party should also include in the flat file (.txt or .dat) a designation that the document is protected and the level of protection, as required by any protective order or agreement.

      3.    <u>Native Format</u>.  If the Producing Party is producing ESI in Native Format subject to a claim that ESI is protected under the Protective Order, then the designation shall be included in the filename and shall be burned electronically on to the TIFF or PDF placeholder or where not produced with a TIFF or PDF placeholder, the storage device (*e.g.*, CD, USB, or hard drive) containing such native ESI data shall be labeled with the designation "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE."  The Producing Party should also include in the flat file (.txt or .dat) a designation that the document is protected and the level of protection, as required by the Protective Order.

**IV.**    **MISCELLANEOUS**

      1.    <u>Variance</u>.  Any practice or procedure set forth herein may be varied by agreement of the Parties without order of the Court.  Failure of the Parties to agree on any modifications for good cause shown may be raised with the Court as necessary and in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules.

**V.**    **PRIVILEGE, PRIVILEGE LOGS, AND CHALLENGES**

    **A.**    **Federal Rule of Evidence 502(d)**

      1.    The Court hereby orders that the disclosure of privileged or otherwise protected information in this action does not act as a waiver of the privilege or protection in any other federal or state proceeding.

    **B.**    **Privileged Documents That Need Not Be Logged**

      1.    <u>General</u>.  The Parties agree that the following privileged documents and ESI ("privileged material") need not be logged:

        a)    privileged material dated after December 28, 2023; and

        b)    privileged material created or received by counsel of record or outside attorneys advising in this matter and their associated attorneys and support staff, including paralegal and secretarial personnel.

2. <u>Additional Exclusions</u>.  The Parties agree that they will confer at a later time to determine whether any other categories of privileged documents can be excluded from the logging requirement and attempt to agree on formats designed to reduce the burden associated with privilege log drafting, such as "categorical" or "metadata only" privilege logs.

3. <u>Preservation of Privileged Materials</u>.  Notwithstanding the above stipulation, all privileged material should be preserved in the event of a later dispute with respect to the propriety of any privilege claim or the sufficiency of the privilege log.

**C.  Format and Contents of Privilege Log**

1. <u>Format</u>.  The privilege log shall be produced as a searchable PDF file.

2. <u>Contents</u>.  If the parties are unable to agree on an alternative logging format as described in V.B. above, documents withheld from production that a Party believes are covered by an attorney-client privilege and/or work product protection, which are not specifically excluded above, should be logged on a privilege log on a document-by-document basis, except as identified below.  The following information should be provided (as applicable) in the privilege log for each document: (1) unique document identification number; (2) document type; (3) family relationship (i.e., parent e-mail or e-mail attachment); (4) date; (5) author; (6) each recipient, broken out separately if applicable to provide To, CC and BCC info; (7) privilege or protection claimed; (8) description of the subject matter of the document or electronically stored information sufficient to enable the requesting party to assess the validity of the privilege claim; and (9) whether the entry applies to an e-mail string, if applicable under the following paragraph.

3. <u>Email Strings</u>.  For those documents that contain a series of e-mail communications in a single document ("email string"), it shall be sufficient to log the 'string' without separate logging of each included communication, but reference to the document as an "email string" should be made in the document description field of the log; and to the extent that different emails within the email string are protected by different privilege bases, the log shall separately identify that within the email string certain emails are subject to one particular privilege claim and other emails within the string are subject to a different privilege claim.  Email strings that are not privileged in their entirety should be redacted if they contain responsive, non-privileged content. The parties will meet and confer if a Receiving Party requests additional information to validate the claim of protection for a specific email string.  Such information shall not be withheld upon good cause shown for the request.

4. <u>Identification of Counsel</u>.  All counsel or their employees (or direct reports for in-house counsel) involved in purportedly privileged communications or work product shall be identified as such in the privilege log.

**D.  Challenges to Privilege Log**

1. <u>General</u>.  If a Requesting Party believes in good faith that one or more items in a Producing Party's privilege log should be produced and are inappropriately being withheld, then it shall raise the issue as to each log entry with the Producing Party in writing with reasonably sufficient detail so that the Producing Party may understand the Requesting Party's complaint.  Within ten (10) business days, the Producing Party shall respond in writing.  If the response does

not satisfy the Requesting Party, then the Parties shall meet and confer and if the dispute as to the privileged nature of the material cannot be resolved, then the Requesting Party may seek relief from the Court as to the specific log entries raised with the Producing Party.

2. Nothing in this procedure to challenge a Party's privilege log modifies the Producing Party's burden to establish the privileged nature of the withheld document.

## VI. **OBJECTIONS**

1. <u>General</u>. By agreeing to enter into this Order, the Parties do not waive any objections to the relevance, responsiveness, production, discoverability, possession, custody, control, or confidentiality of Documents, including (without limitation) objections regarding the burden, over-breadth, or relevance of document requests related to Documents. Nothing in this Stipulated Order shall be interpreted to require the disclosure of irrelevant information, unduly burdensome collection of or search for Documents, or production of relevant information protected by the attorney-client privilege, work product immunity, or any other applicable privilege or immunity or is otherwise not discoverable.

2. <u>No Waiver of Rights Regarding Review</u>. By entering this Order, a Party is not giving up its right to review its documents for privilege or any other reason (including to identify non-responsive documents) and the existence of this Order cannot be used to compel a Party to produce documents without review. Moreover, this Order does not mean that the cost of review should not be considered in whether any particular discovery is disproportionate (*i.e.*, that the marginal benefit of the discovery is not as great as the marginal cost of said discovery including review).

3. <u>Disputes</u>. The Parties will meet and confer in an attempt to resolve any objections if necessary.

It is so ORDERED.

Signed and entered this _____ day of _____, 2024.

                                                                       _____
                                                                       Mario Garcia
                                                                       United States Magistrate Judge
                                                                       Southern District of Indiana

Agreed as to Form and Content:

*/s/ J. Campbell Miller*
J. Campbell Miller
Joel B. Rothman (pro hac vice)
Joseph A. Dunne (pro hac vice)
*Counsel for Defendant*

*/s/ Samuel J. Banks*
RICHARD DANIEL KELLEY
(*admitted pro hac vice*)
rkelley@beankinney.com
RAIGHNE COLEMAN DELANEY
(*admitted pro hac vice*)
rdelaney@beankinney.com
STEPHEN DANIEL CARUSO
(*admitted pro hac vice*)
scaruso@beankinney.com
SAMUAL JOSEPH BANKS
(*admitted pro hac vice*)
sbanks@beankinney.com

**BEAN, KINNEY & KORMAN, PC**
2311 Wilson Boulevard, Suite 500
Arlington VA 22201
703.525.4000 – Telephone

and

ALEXANDRA WILSON PANTOS
Indiana Bar Number: 37003-49
awilson@kdlegal.com

**KRIEG DEVAULT LLP**
One Indiana Square, Suite 2800
Indianapolis, IN 46204
317.238.6341 – Telephone
317.636.1507 - Facsimile

and

MARC T. QUIGLEY
Indiana Bar Number: 21054-53
mquigley@kdlegal.com

**KRIEG DEVAULT LLP**
12800 North Meridian Street, Suite 300
Carmel, IN 46032
317.636.1110– Telephone
317.636.1507 – Facsimile
*Counsel for Plaintiff Triangle Experience Group, Inc.*

# EXHIBIT 1

## DOCUMENT PRODUCTION FORMAT SPECIFICATIONS

It is proposed that documents be exchanged in an electronic format. The following information outlines proposed production specifications. To the extent the production format specifications listed below conflict with the terms of the ESI Protocol set forth above, the ESI Protocol shall control.

**A.     Format**

Produced documents will be provided as black and white, Group IV single page TIFF images, 300 DPI, named the same as the Bates number (without embedded spaces or special characters) or in PDF format. Color images will be provided in jpg/jpeg format. Parties will produce all non-redacted spreadsheet (*e.g.*, Excel, Lotus, Google Sheets, CSV, etc.) files and media files (e.g. Wav, Mp4, etc) in Native format. As standard practice, no other native files will be produced. Other native files will only be provided as the parties may agree (on an individual document-by-document basis) or as the Court may order.

**B.     Load File Specifications**

In order to facilitate loading the images into document review software, a standard image load file indicating document boundaries and location of images will accompany the images. The load file will be in an Opticon compatible format.

**C.     OCR**

Machine generated OCR created from scanned images or redacted documents will be provided at a document level. There will be one OCR text (.txt) file per document, named the same as the beginning Bates number (Document ID) of the document. The OCR text file associated with any redacted document will exclude redacted text.

**D.     Extracted Text**

The extracted text taken from the native file will be provided at a document level. There will be one extracted text file per document, named the same as the beginning Bates number (Document ID) of the document. The extracted text file associated with any redacted document will be replaced with an OCR text file which excludes redacted text.

**E.     Default Production Fields**

The following default fields will be provided for all documents in the production.

| **FIELD NAME** | **DESCRIPTION** |
|---|---|
| Begin Bates | Beginning Bates Number |

| | |
|---|---|
| End Bates | Ending Bates Number |
| Bates Range | Bates Range for Email |
| BeginAttachment | Beginning Bates Number of a Family Group |
| End Attachment | Ending Bates Number of a Family Group |
| Att Count | Number of attachments to an email |
| Attachment Name | The file name(s) of all attachments. |
| ParentID | Bates Number of the Parent Email (populated for attachments only) |
| Child ID | Bates Number of the Attachment (s) (populated for Parent Emails only) |
| Custodians | The original custodian, and all other custodians, separated with a multi-value delimiter, from whom the Document was collected and who possessed the document. For documents from centralized repositories where custodian name is unavailable, identifying source information should be provided. |
| Page Count | Number of pages in a document |
| Confidential Properties | Populated with the confidentiality status |
| Redaction Properties. | Populated with the redaction status. |
| ProdVol | Name of media on which the data was produced. |
| Original Author | Name of user who created the file. |
| Created Date | Date the file was created. |
| Created Time | Time the file was created. |
| Last Modified Date | Date the file was last modified. Time |
| Last Modified Time | the file was last modified. Name of |
| Last Saved By | user who last saved the file. Original |
| File Name* | name of the file. |

F. **Metadata Fields**

The following metadata fields will be exchanged. Specific metadata associated with redacted documents may be withheld from the production if the metadata field is likely to contain privileged or protected information, subject to the requesting party's right to seek production.

| **FIELD NAME** | **DESCRIPTION** |
|---|---|
| Subject | Subject Line of the Email |
| File Name | Name of the File as maintained in the ordinary course |
| File Extension | File Extension |

| | |
|---|---|
| Sent Date | Email Sent Date |
| Received Date | Email Received Date |
| Created Date | Date File was Created. |
| Modified Date | Date File was Last Modified |
| Author | Author of the Application file |
| From | Sender of an Email |
| To | Recipients of the Email |
| CC | CCs of the Email |
| BCC | BCCs of the Email |
| File Type | Email, Spreadsheet, Word Processing Document, etc. |
| File Path | Location of the file or email as it is maintained in the ordinary course |
| Record Type | Type of file – Email, attachment, or eFile |
| Email Sent Time | Time email was sent |
| Email Received Time | Time email was received |
| File Created Time | Time application file was created |
| Native File | Native files named after the Bates number, *e.g.*, E00001.xls (in contrast to File Name which is the original name of the file) and their path on the delivery media. |
| MD5 Hash | Value commonly used to de-duplicate files or identify duplicates |
| Time Zone Offset | UTC−00:00 |

Metadata will be provided in a flat file (.txt or .dat).  Each line will begin with the fields Beg Bates and End Bates.  Please use default Concordance delimiters, as follows:

- Field delimiter – ASCII character 20 (¶)
- Text delimiter – ASCII character 254 (þ)
- Newline indicator – ASCII character 174 (®)

**G. Native Production Format**

Native files will be produced only to the extent described in this Order, as the parties may agree, as included in the Protective Order, or as the Court may order.  If native files are produced, their formatting will be as follows:

- Native files will not be produced for any redacted document, except that natively redacted Excel or Google Sheets documents are acceptable so long as the original metadata (less redacted text) is preserved and produced and the redacted documents can easily be identified in a party's production.

- Native files will be produced with a Bates stamped image indicating that the file was produced natively.
- Native files will be named the same as the beginning Bates number (Document ID) as the Bates stamped image.
- Where documents are produced in native form, a full path to the native document must be included in the Native File field in the production load file.

1. Source Code

The parties will produce any and all source code files in native format. For source code files stored in source code repositories or version control systems (e.g., Subversion, Git, Mercurial, Perforce, etc.), a native copy of the source code repositories shall be produced in a compressed archive assigned a single Bates number and marked "Highly Confidential, (AEO) – Source Code" and produced in a way that will permit the receiving party to view the metadata contained in the source code repository or version control system about changes to the source code over time contained in the source code repository or version control system. Production of a backup copy of the repository, a restorable repository dump, a "clone" in a native format of the repository, or read-only access to any online systems used to store and manage a party's source code repositories is agreed to be sufficient for these purposes. For source code files stored outside of a source code repository or version control system (*e.g.*, on a programmer's individual workstation, on network attached storage, etc.), such files will be produced in native format in a compressed archive assigned a single Bates number that retains any folder structures used to organize the source code files.

2. Software

The parties will produce any and all software files in native format. Software files shall be produced in a compressed archive assigned a single Bates number and shall include all files and folder structure necessary to run or install any produced software.