UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS

CASE NO.: 1:24-CV-00650

TRIANGLE EXPERIENCE GROUP, INC.,

    *Plaintiff*,

v.

MAX MINDS, LLC,

    *Defendant*.

---

**REPLY TO TRIANGLE EXPERIENCE GROUP, INC.'S OPPOSITION TO MAX MINDS, LLC'S MOTION TO DISMISS COUNTS I AND VI OF THE AMENDED COMPLAINT**

Defendant MAX MINDS, LLC ("Max"), by and through its undersigned counsel, submits this brief in reply to Plaintiff Triangle Experience Group, Inc.'s ("TEG") opposition to Max's motion to dismiss Counts I and VI of TEG's First Amended Complaint (ECF 90). Pursuant to Fed. R. Civ. P. 12(b)(6), this Honorable Court should dismiss Counts I and VI, having grounds as follows:

### A.     The Opposition Fails to Explain How the FAC States a Plausible Claim

Max argued that the FAC's claim for declaratory judgment of "Joint Authorship/Co-Ownership" of Max's Haptic Federal software and source code failed to plausibly state a claim and therefore must be dismissed. (ECF 97). Max argued that TEG's FAC contained merely conclusory assertions of joint authorship without any factual basis. TEG's conclusory assertions are insufficient. Max argued that in order to maintain a claim for joint authorship, TEG must show that (1) the contribution of each joint author is copyrightable (i.e., each contribution must represent "original expression that could stand on its own as the subject matter of copyright");

and (2) "the parties must have intended to be joint authors at the time the work was created." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1063 (7th Cir. 1994) (internal quotations omitted). The FAC contained no facts showing that TEG contributed independently copyrightable contributions to Haptic Federal necessary for a finding of joint authorship, ownership, or co-authorship of copyright.

In opposition to the motion, TEG offered nothing more than the following:

> The software at the center of this dispute was founded upon preexisting software that TEG had been independently supplying to the federal government for over a decade prior to meeting Max. (See e.g., Dkt. 90 ¶¶ 11, 18-20, 25.) In fact, TEG alleges that Max approached TEG by suggesting that the parties "build and improve" upon TEG's existing software system. (Id. ¶ 27.) Throughout their partnership, TEG and Max worked together to create and develop the new software, (id. ¶¶ 26-29, 36, 68-71), and TEG helped improve and fix bugs in the software and its source code along the way. (Id. ¶¶ 38-43, 48, 50-52, 57-61.) The terms of the parties' JVA further evidences their collaborative efforts and contributions to the software, (Dkt. 90-1 at 2), as well as their co-ownership of the software and its source code. (Dkt. 90 ¶¶ 1, 34-35; Dkt. 90-1 at 3, 4.) All of these factual allegations, if proved, can and will constitute independently copyrightable contributions sufficient to support TEG's claim of joint authorship and co-ownership of the software at the heart of this matter.

(ECF 98 at 6).

The argument above contained in the opposition to the motion does not save the FAC. Let's parse it out one sentence at a time. The first sentence claims that Haptic Federal "was founded upon preexisting software that TEG had been independently supplying to the federal government for over a decade prior to meeting Max" and cites paragraphs 11, 18-20, and 25 for support. Look back to the FAC. Paragraph 11 says that C4MAP was "[o]ne of TEG's premier services provided to its government customers;" paragraph 18 says "TEG has enjoyed a long history of providing C4MAP/VJOC" to the DOD; paragraph 19 says "C4MAP, like any operating system, requires a source code;" paragraph 20 says "C4MAP was powered by a source

code known as 'Synthesis;'" paragraph 21 says "Fischer was formerly a senior software developer at Prysm," which made Synthesis; and paragraph 25 says that in July of 2019 "Max did not have a complete, working software product."

All these statements combined, even if true (which they are not), do not support a conclusion that TEG supplied its own copyrightable and authored "preexisting software" source code to the federal government that Haptic Federal could have been "founded upon." Haptic Federal was not "founded upon" anything preexisting that belonged to or was created by TEG. Max, in fact, brought its own preexisting Haptic software to the joint venture, which TEG admits, regardless of TEG's mischaracterization of that software as "not…complete, working." (ECF 90 ¶25). TEG's claim that the "preexisting software" was something TEG created is nowhere supported in the FAC. In fact, the FAC says the opposite: TEG did not write source code, but rather it cobbled together COTS software to make "C4MAP" and "VJOC." (*Id.* ¶12). C4MAP and VJOC are nothing more than a collection of COTS software that DOD could itself assemble if it wanted to.

Moving on to the next sentence: "Max approached TEG by suggesting that the parties 'build and improve' upon TEG's existing software system" cites paragraph 27 of the FAC, which states:

> After entering into the MNDA agreement, TEG brought Fischer/Max to a federal government lab in Suffolk, Virginia. TEG then showed Fischer the critical information necessary to operate a virtual collaborative workspace. Fischer explained to TEG that he wanted TEG to hire and/or partner with Max to build and improve TEG's C4MAP system with new software to deliver C4MAP's capabilities.

Haptic is Max's original software, not TEG's software. The JVA does not change this fact. Software development, in its normal course, is an iterative process as users exercise its functionality and developers modify the source code to improve the functionality. Software users

3

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

find issues, and software developers fix those issues. The development of Haptic Federal under the JVA used such an iterative process in which Max was (and still is) the developer, and in accordance with the JVA, TEG gathered issues from its federal customers, the users. (ECF 90, Ex. 1, at 2; ECF 97 at 3). While users may have tested Max's Haptic Federal software on the C4MAP/VJOC platform, Haptic did not require TEG's COTS-based C4MAP/VJOC to meet Max's requirement under the JVA to develop software for marketing to the federal government. While "two instances of Haptic Federal…will be used for testing and development and…demonstrations," "both instances will be *installed in* the TEG commercial data center." (ECF 90, Ex. 1, at 3) (emphasis added). Nothing in the JVA requires TEG's COTS C4MAP/VJOC platform as a *foundation for development of* the Haptic Federal software. *See* ECF 90, Ex. 1.

The point of entering into the MNDA, the point of the meeting in Suffolk, Virginia, and the point of Max developing Haptic Federal to meet the needs of the federal government under the JVA were for Max to provide software for TEG to sell to the federal government.

Next, in alleging that the parties "worked together to create and develop the new software, and TEG helped improve and fix bugs in the software and its source code along the way," TEG cites paragraphs 26-29, 36, 38-43, 48, 50-52, 57-61, and 68-71. (ECF 98 at 6). None of those paragraphs, nor any other allegations of the FAC, are supported by evidence that TEG wrote copyrightable source code or further developed source code to "improve or fix bugs" in Haptic Federal.

TEG next claims "the parties' JVA further evidences their collaborative efforts and contributions to the software, as well as their co-ownership of the software and its source code." *Id.*, citing ECF 90, Ex. 1, at 2. The JVA evidences no such thing. The JVA attached to the

FAC—and therefore considered a part of the complaint under Fed. R. Civ. P. Rule 8—shows that Max—not TEG—was the sole developer, owner, and creator of the software. (ECF 90, Ex. 1). The JVA appoints Max as the party responsible for developing and engineering the software, specifying that "Max will develop and engineer capabilities to support the customer needs." *Id.* at 2.

By the time the parties entered into the JVA, Max had been marketing Haptic to commercial entities and the U.S. government for over six months. The purpose of the JVA was to appoint TEG "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]" *Id.* at 3. Under the JVA, TEG agreed to perform marketing and sales, specifically to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements." *Id.* at 2. TEG was required to "establish and manage all federal channel sales partnerships." *Id.* at 4.

While TEG and Max were to share some marketing and management duties, the JVA was importantly not a joint development agreement ("JDA"). "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]" *Id.* at 3. "TEG and MAX agree[d] to conduct routine project and program management review discussions." *Id.* The JVA specifically describes TEG's duties under the JVA as selling Max's software to government customers and maintaining relationships with government customers: "[TEG's market] exclusivity comes with TEG's ability to sell, market, install, train, maintain the [software]. Considering, Max concentrates on the development and engineering of its platform [referring to the software]." (emphasis added). *Id.* at 2.

The JVA does not allow TEG to contribute code to Max's software. Further, nothing in the JVA granted TEG ownership rights in the Haptic Federal software for unilateral modification or other software development or use outside of the JVA.

TEG's allegations regarding its contributions to the software are scant and conclusory. TEG alleges that "[i]n the spring of 2018, TEG and [Max's CEO Brandon] Fischer … began exploring the opportunity to work together, with Fischer providing the source code to power" a software solution TEG intended to sell to the government. (ECF 90 ¶ 23). TEG alleges that "[t]hroughout the time period of 2019 and continuing thereafter, TEG and Max worked together to create and develop the Haptic Software." Fischer and TEG began "co-developing" the software in 2019. However, no detail concerning any code that TEG employees wrote is contained in the Amended Complaint. Instead, TEG alleges in a conclusory fashion that "Haptic was intended to be and was a joint work of both TEG and Max." (ECF 90 ¶¶ 27, 36, 68-69).

TEG also alleges that it "had control and decision-making authority over the software and how contributions to the software would be incorporated." (ECF 90 ¶ 70-71). TEG claims that this "control and decision-making authority" entitled it to be a "joint author," but nowhere does TEG allege that any TEG employees actually contributed software code.

B.     The Scant Factual and Legal Basis for the FAC

TEG's allegations based on ownership or development of software appear to rest on two false assertions: (1) that TEG contributed or shared software with Max in the beginning of the parties' relationship that Max incorporated into Max's Haptic software, and (2) that TEG contributed or shared "ideas" or "pseudo code" with Max that Max incorporated into Max's Haptic software. Neither of these assertions—even if true, and they are not—would give TEG an ownership interest or rights to claim authorship in Max's software. Neither assertion is sufficient factually or legally to entitle TEG to any rights whatsoever.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

The FAC contains a hodge-podge of allegations concerning the relationship between Max and TEG. In Section A., we learn the following background facts—a direct quote of paragraphs 11 through 22—with special attention provided below to the **bolded words and phrases**:

> 11. One of TEG's premier services provided to its government customers is an **operating system** originally known as "**C4MAP**" - "**Comprehensive Collaborative Command & Control Mission Application Platform**."
>
> 12. C4MAP is a collection of **commercial off the shelf ("COTS")** software components which integrates multiple mission command platforms and collaboration tools into one common operational picture ("COP").
>
> 13. C4MAP provides a globally military-hardened, distributed, synchronized, uniform collaborative, highly secure **operation center**. In essence, C4MAP provides the fusion and interconnection of information on a single screen, which has limitless benefits to the United States government and its Department of Defense.
>
> 14. **C4MAP** is also known as a **"Virtual Joint Operations Center" or "VJOC"** capability in the Department of Defense ("DoD") and intelligence community.
>
> 15. C4MAP, or VJOC, is a **server-based collaborative workspace** that uses a **browser interface** to enable users to collaborate in real time. VJOC has **screensharing** capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the VJOC workspace.
>
> 16. The VJOC workspace is an infinite canvas of screen real estate that operates synchronously for all members in real-time.
>
> 17. The benefits of VJOC to the United States Department of Defense are essentially limitless and incredibly valuable.
>
> 18. TEG has enjoyed a long history of providing C4MAP/VJOC and its capabilities to the Department of Defense.
>
> 19. C4MAP, like any **operating system**, requires a **source code** for configuration, installation, operation, integration and deployment to deliver capabilities.
>
> 20. Initially, C4MAP was powered by a source code known as "**Synthesis**," which was owned by a company known as **Prysm**.
>
> 21. Fischer was formerly a **senior software developer at Prysm** with the title Vice President.

7

22. While a Prysm employee, Fischer attended multiple presentations of C4MAP, during which time **TEG and its engineers demonstrated C4MAP and its capabilities**.

(ECF 90 ¶¶ 11-22). Let's focus first on defining the bolded terms.

- An **operating system** (OS) is system software that manages computer hardware and software resources, and provides common services for computer programs. See https://en.wikipedia.org/wiki/Operating_system visited November 27, 2024.

- "**Source code**" is a plain text computer program written in a programming language. A programmer writes the human readable source code to control the behavior of a computer. See https://en.wikipedia.org/wiki/Source_code visited November 27, 2024.

- **Commercial-off-the-shelf** or commercially available off-the-shelf (**COTS**) products are packaged or canned (ready-made) hardware or software, which are adapted aftermarket to the needs of the purchasing organization, rather than the commissioning of custom-made, or bespoke, solutions. A related term, **Mil-COTS**, refers to COTS products for use by the U.S. military. See https://en.wikipedia.org/wiki/Commercial_off-the-shelf visited November 27, 2024.

- By "**secure operations center**" it appears TEG is referring either a command center or a control room. A "**command center**" (often called a **war room**) is any place that is used to provide centralized command for some purpose. See https://en.wikipedia.org/wiki/Command_center visited November 27, 2024. A "**control room**" or operations room is a central space where a large physical facility or physically dispersed service can be monitored and controlled. It is often part of a larger command center. https://en.wikipedia.org/wiki/Control_room visited November 27, 2024.

- By "**server based collaborative workspace**" it appears TEG is combining several terms. A **server** is a computer that provides information to other computers called "clients" on a computer network. See https://en.wikipedia.org/wiki/Server_(computing) visited November 27, 2024. By **collaborative** it appears TEG is referring to "collaborative software" of which there are hundreds if not thousands of examples currently. See https://en.wikipedia.org/wiki/List_of_collaborative_software visited November 27, 2024. A **workspace** in technology and software can be used to describe (1) a file or directory that allows a user to gather various source code files and resources and work with them as a cohesive unit; or (2) the grouping of windows in some window managers; or (3) in the context of computer-supported cooperative work (CSCW) a shared workspace is a place of collaboration that enables group awareness. See https://en.wikipedia.org/wiki/Workspace and

https://en.wikipedia.org/wiki/Computer-supported_cooperative_work visited November 27, 2024.

- A "**browser user interface**"(or **BUI**) is a method of interacting with an application, typically hosted on a remote device, via controls presented within a web browser.  See https://en.wikipedia.org/wiki/Browser_user_interface visited November 27, 2024.

- "**Screensharing**" or "**screen sharing**" refers to a remote desktop software or operating system feature that allows a personal computer's desktop environment to be run remotely from one system (usually a PC, but the concept applies equally to a server or a smartphone), while being displayed on a separate client device. See https://en.wikipedia.org/wiki/Remote_desktop_software visited November 27, 2024.

- .The terms "**Comprehensive Collaborative Command & Control Mission Application Platform**" and "**C4MAP**" and "**Virtual Joint Operations Center**" and "**VJOC**" are all terms made up by TEG. There are no recognized definitions for these terms. The terms are found at the TEG website here: https://www.triangleexperience.com/ visited November 27, 2024.

By applying the recognized definitions for the terms used by TEG in the FAC to the facts alleged in paragraphs 11 through 22, one would be compelled to draw the following false conclusions:

   a. That TEG's "**C4MAP**" and "**VJOC**" are "**operating systems**" that "that manages computer hardware and software resources, and provides common services for computer programs." However, this conclusion is **false**. C4MAP and VJOC do not manage hardware or software, and they do not provide common services for computer programs.

   b. That TEG created "**C4MAP**" and "**VJOC**" by writing "**source code.**" However, that conclusion is **false**. TEG did not write source code, and in fact its statement that it created "**C4MAP**" and "**VJOC**" by cobbling together COTS software contradicts any claim that TEG wrote or created source code.

   c. That TEG's "**C4MAP**" and "**VJOC**" provide an "**operations center**." That is **false**. The government has operations centers already. The government secures those operations centers. TEG did not provide that to the government.

   d. That TEG's "**C4MAP**" and "**VJOC**" provide a "fusion and interconnection of information on a single screen." That is **false**. The "fusion and

interconnection of information on a single screen" is a function provided by Max's Haptic Federal software, not TEG's "**C4MAP**" and "**VJOC**".

e. That "**C4MAP**" and "**VJOC**" provide a "**server-based collaborative workspace** that uses a **browser interface** to enable users to collaborate in real time." That is **false**. The "**server-based collaborative workspace**" is provided by Max's Haptic Federal software, not TEG's "**C4MAP**" and "**VJOC**".

f. That "**C4MAP**" and "**VJOC**" use "a **browser interface** to enable users to collaborate in real time." That is **false**. The use of "a **browser interface** to enable users to collaborate in real time" is a service provided by Max's Haptic Federal software, not TEG's "**C4MAP**" and "**VJOC**".

g. That "**C4MAP**" and "**VJOC**" have "**screensharing** capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the VJOC workspace." That is **false**. "Screen sharing" is a functionality provided by many different programs. In this case, the "screen sharing" functionality TEG is talking about is provided by Max's Haptic Federal software, not TEG's "**C4MAP**" and "**VJOC**".

h. That "**C4MAP**" and "**VJOC**" "is an infinite canvas of screen real estate that operates synchronously for all members in real-time." That is **false**. The "infinite canvas that operates synchronously for all members in real-time" is a service and function of Max's Haptic Federal software, not TEG's "**C4MAP**" and "**VJOC**".

i. That "the benefits of VJOC to the United States Department of Defense are essentially limitless and incredibly valuable" is **false**. Since VJOC is nothing more than a collection of COTS software, DOD could assemble that software itself. DOD does not need TEG for that. What TEG has that DOD wants is the Haptic Federal software that TEG stole from Max.

j. That "TEG has enjoyed a long history of providing C4MAP/VJOC and its capabilities to the Department of Defense" is **false**. TEG's history is brief. TEG would have no "capabilities" but for its theft of Max's Haptic Federal software.

k. That "C4MAP was powered by a source code known as "**Synthesis.**" That is **false**. Synthesis was not a "source code." Synthesis was not an "operating system" either.

l. That "Fischer was formerly a senior developer at Prysm." He was not. Fischer did not develop software at Prysm.

On the last point, TEG's overtures to Brandon Fischer, Max's CEO, began in March of 2018, less than 3 weeks after Fischer left his prior company Prysm and while Fischer was under a Non-Compete Agreement (Non-Compete) regarding Prysm's Synthesis software. TEG was previously a customer of Prysm and asked Fischer if he could make modifications to the Synthesis source code for TEG. Fischer told TEG he had a Non-Compete, and a source code license and permission from Prysm would be necessary. (Mullican Tr. 34:1-13; Miller Decl., Ex. 3).

From a factual standpoint, the reality is that Fischer waited for his Non-Compete to expire, and thereafter, Fischer independently developed Haptic. TEG invited Fischer to present a demonstration of Haptic in July 2019 at the U.S. Government Joint Staff Lab in Norfolk, Virginia. Before the demonstration, Max and TEG entered into a mutual NDA. These facts are already alleged in Fischer's declaration in support of the preliminary injunction Max seeks in the companion case. (Mullican Tr. 34:1-13; Miller Decl., Ex. 3). TEG knows these facts. TEG ignores them in the FAC.

In summary, the FAC's factual allegations are scant and insufficient to state a claim for a declaratory judgment of co-ownership or co-authorship.

### C. TEG's Failure to State a Claim for a Declaratory Judgment is Fatal to its Claim for Cancelation.

For the reasons stated in Sections A and B above, TEG fails to allege facts sufficient to state a claim for declaratory judgment under Count VI of TEG's FAC (ECF 90). Max has sufficiently shown above why TEG's opposition to Max's motion to dismiss Count VI continues to allege "facts" insufficient to support a conclusion that TEG is co-author or co-owner of the software at issue. TEG was appropriately not listed in any copyright registrations for Max's software because TEG is not a co-author or co-owner of the software under the Copyright Act.

TEG has no standing under the Copyright Act to seek cancelation of Max's copyrights in Max's source code at least because TEG is not the legal copyright owner. Max is the sole and exclusive owner of copyright registrations TXu 2-425-362, TXu 2-421-490, TXu 2-419-714, TXu 2-419-718 to Max's Haptic software. Further, Max has a plausible claim for copyright infringement under the companion Max v. TEG case. The court must accept Max's allegations for copyright infringement as true and construe all plausible inferences in its favor. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *see*, *also*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). And, while there is no ambiguity over Max's copyright ownership, any such ambiguity must also be construed in Max's favor. *See Hishon*, 467 U.S. at 73.

Count VI of TEG's FAC seeks a declaratory judgment from this Court that Max's copyrights are "inaccurate and incomplete" and an order from this Court "to cancel any and all copyright registrations in which it is listed as the sole author and/or claimant for rights in the software." *See* ECF 90 ¶ 93, DEMAND 4. However, Federal courts have no authority, and have not exercised authority, to cancel copyright registrations at least because there is no statutory authority for such. *See, e.g.*, *Brownstein v. Lindsay*, 742 F.3d 55, 75 (3d Cir. 2014) (holding "that courts have no authority to cancel copyright registrations because there is no statutory indication whatsoever that courts have such authority. Also, there is substantial indication that courts do not have such authority"); *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781-82 (9th Cir. 2002) (holding that cancellation of a copyright registration is an administrative remedy that must be sought from the Copyright Office).

As Max has already shown, this Court lacks subject matter jurisdiction for a declaratory judgment that seeks Max's copyrights as invalid because this Court does not have authority to cancel a copyright. (ECF 97 at 8-9).

Without such declaratory judgment, TEG simply cannot seek cancelation through this Court. Further, declaratory judgment would serve no purpose because the validity of Max's copyrights would be resolved through Max's copyright infringement complaint in the companion Max v. TEG case (not the instant case). Even if "[a party] in a copyright infringement lawsuit [can] ask the court to issue an order directing a party to cancel his or her registration," as suggested by TEG (ECF 98 at 8-10, quoting U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1807.4(F) "Court Ordered Cancellation" (3d ed. 2021)), TEG's demand of this Court has two problems: (1) the instant case is not "a copyright infringement lawsuit," and (2) TEG has not identified a court that has issued such an order.

As to the second point, TEG cites to a non-binding recommendation to the District Court in *Trevari Media Ltd. Liab. Co. v. Cantu*, No. 6:23-cv-1879, 2024 U.S. Dist. LEXIS 127285, at **20-21 (D. Or. June 20, 2024), in which a magistrate judge issued a report and recommendation ("R&R" entered as ECF 30 in *Trevari Media*) that also did not cite any court decision ordering a party to cancel a copyright. *See* ECF 98 at 9. The court in *Trevari Media* has yet to enter an order on the motion at issue. *See Trevari Media Ltd. Liab. Co. v. Cantu*, No. 6:23-cv-1879, ECF 38 (Dec. 5, 2024, order vacating *Trevari Media*'s ECF 30).

Although an order to cancel a copyright may be theoretically possible, TEG has not cited to, and cannot cite to, any case in which a court has issued such an order to a copyright holder. In other words, despite TEG's attempt to persuade this Court otherwise, the court in *Trevari Media*

had not "den[ied a] motion to dismiss counterclaim for 'copyright cancellation'" as TEG incorrectly alleges. TEG's opposition to Max's motion to dismiss Count VI is simply misleading.

## II. CONCLUSION

Counts I and VI of TEG's Amended Complaint should be dismissed.

Dated: December 6, 2024      Respectfully submitted,

*/s/ J. Campbell Miller*
J. CAMPBELL MILLER
Bar Number: 38279-49
campbell.miller@sriplaw.com
**SRIPLAW, P. A.**
231 South Rangeline Road Suite H
Carmel, Indiana 46032
332.600.5599 – Telephone
561.404.4353 – Facsimile

and

JOEL B. ROTHMAN (*Pro Hac Vice*)
joel.rothman@sriplaw.com
**SRIPLAW, P. A.**
21301 Powerline Road
Suite 100
Boca Raton, Florida 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

and

JOSEPH A. DUNNE (*Pro Hac Vice*)
joseph.dunne@sriplaw.com
**SRIPLAW, P. A.**
41 Madison Avenue
25th Floor
New York, New York 10010
929.200.8446 – Telephone
561.404.4353 – Facsimile

and

PHILIP D SEVER
Bar Number: 25384-49
phil@landownerattorneys.com

**SEVER, STORY, WALKER**
742 South Rangeline Road
Carmel, IN 46032
317.961.1202 - Telephone

*Counsel for Max Minds, LLC*